**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PERRY A. MARCH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:12-cv-272** |
| | ) | |
| **DAVID SEXTON, Warden,** | ) | **Judge Sharp** |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM AND ORDER**

Before the Court is petitioner Perry March's Amended Motion for Sanctions (ECF No. 53), which replaces and supersedes his original Motion for Sanctions (ECF No. 51). The respondent (referred to herein as the "State") has filed a response in opposition to the amended motion, and the petitioner has filed a reply brief. The motion is ripe for consideration. For the reasons set forth herein, the motion will be denied.

**I.      FACTUAL BACKGROUND**

This motion arises in the context of petitioner March's petition for habeas corpus under 28 U.S.C. § 2254. One of the grounds for relief asserted in the habeas petition is that the state court's ruling violated March's Sixth Amendment right to counsel when it failed to exclude from evidence tape-recorded conversations between March and a fellow inmate, Nathaniel Farris, which took place while March was in jail pending trial on charges of murdering his wife, Janet Levine March.

At the time these tape-recorded conversations took place, Farris was cooperating with and working as an informant for the Metro Nashville Police. In the recorded conversations, March did not make any statements directly pertaining to the murder of his wife, and there is no evidence that the police intended for Farris to elicit information pertaining directly to Janet March's murder. Rather, March and Farris discussed a plan pursuant to which Farris would murder Janet March's parents, Lawrence and Carolyn Levine, and then would seek refuge in Mexico with March's father, Arthur March.

Perry March's right to counsel under the Sixth Amendment had clearly arisen with respect to the charge of murdering his wife, for which March had already been indicted, by the time the police recorded

the conversations between March and Farris. March had not yet been indicted, however, on charges of conspiracy to murder the Levines. March filed a motion to suppress the taped recordings of his conversations with Farris, but the trial court denied the motion and admitted the recordings into evidence in March's murder trial. March was ultimately convicted of second degree murder and related charges in the state court. In his direct appeal, March again argued that permitting the jury to hear the recorded conversations between Farris and him in which they discussed a plan to kill Lawrence and Carolyn Levine violated March's Sixth Amendment right to counsel. The Tennessee Court of Criminal Appeals affirmed.

March raised the issue in his habeas corpus petition in this Court. In response, the State argues that March is not entitled to relief on this issue on the basis that the state court's denial of relief was not contrary to, and did not involve an unreasonable application of, clearly established federal law, which is the standard for providing relief under 28 U.S.C. § 2254. More specifically, the State contends that the there is no controlling Supreme Court case law on the issue raised by March in this case, as follows:

> The precise issue presented [by the petitioner's claim for habeas relief], *i.e.*, whether an indicted defendant's voluntary statements about a separate offense for which he has not been formally charged are admissible, if relevant, in the trial of the indicted offenses, has not been specifically addressed by the United States Supreme Court in its Sixth Amendment jurisprudence. To the extent that the United States Supreme Court has not ruled upon the issue, there was no clearly established federal law for the state court to allegedly unreasonably apply.

(ECF No. 33, at 72–73.)

March has now filed his motion for sanctions in which he contends that the statement quoted above is "a patently *false* legal contention," and further that it is "an overt, brazen and deliberate lie, which demands sanctions by this Court" under Rule 11 of the Federal Rules of Civil Procedure. (ECF No. 53, at 3.) In response, the State objects that the petitioner failed to comply with the "safe harbor" provision in Rule 11(c)(2), and further maintains that the statement to which March objects is not an incorrect statement of law.

## II.     STANDARD OF REVIEW

Rule 11 of the Federal Rules of Civil Procedure imposes three obligations on an attorney who signs and files a document in federal court. These are (1) to conduct a reasonable inquiry to determine that the pleading, motion or other document is well grounded in fact; (2) to conduct a reasonable inquiry to determine that the positions taken are warranted by existing law or as a good faith argument for the

extension or modification of existing law; and (3) not to file a document for an improper purpose. *Jackson v. Law Firm of O'Hara et. al.*, 875 F.2d 1224, 1229 (6th Cir. 1989). Generally speaking, a failure to adhere to these obligations may result in the imposition of sanctions. *See Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) ("Under Federal Rule of Civil Procedure 11, sanctions may be imposed if a reasonable inquiry discloses [that a] pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." (citation omitted)). The purpose of Rule 11 sanctions is to deter abuse of the legal process. *Id.* In the Sixth Circuit, the test for whether sanctions under Rule 11 are warranted is whether the conduct for which sanctions are sought was "reasonable under the circumstances." *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997); *Runfola & Assocs. v. Spectrum Reporting II*, 88 F.3d 368, 372 (6th Cir. 1996).

However, Rule 11 also contains a "safe harbor" provision, which prescribes the procedure that the party seeking sanctions under Rule 11 must follow: That party must first serve on the opposing party a separate motion describing the objectionable conduct as provided in Rule 5, and must not file or present the motion to the court unless the challenged paper is not withdrawn or appropriately corrected within 21 days after service of the motion. Fed. R. Civ. P. 11(c)(2).

## III. DISCUSSION

As set forth above, the State insists that March is not entitled to sanctions, both because March failed to comply with the mandatory procedure established by Rule 11 for bringing a motion for sanctions, and because the purportedly false statement of law is not false. Because it is apparent that the State would not have withdrawn the contested statement even if March had followed the safe-harbor procedure, and because the Court agrees that March is not entitled to sanctions, the Court will address the merits of March's motion.

March insists, in a tone that can only be characterized as histrionic, that the Supreme Court in *Moulton v. Maine*, 474 U.S. 159 (1985), was confronted with and resolved the precise issue presented by the circumstances in his case. March, who, to paraphrase Shakespeare, clearly protests too much, is simply wrong.

*Moulton*, as discussed in this Court's memorandum addressing March's habeas petition, filed contemporaneously herewith, involved the admissibility of a defendant's uncounseled post-indictment statements to a co-defendant who was operating as an undercover agent for the State, but the statements were directly incriminating as to the already-charged crimes. In that case, Moulton and his co-defendant, Colson, were both indicted by a county grand jury in Maine on multiple counts of receiving stolen property. Both defendants retained counsel, entered pleas of not guilty, and were released on bound. Prior to trial, however, Colson indicated to the local chief of police that he wished to meet with the police to talk about the charges against him. Before that meeting occurred, Colson met with Moulton to plan for their upcoming trial. During the discussion, Moulton suggested the possibility of killing Gary Elwell, a witness for the state, and the two defendants discussed how to commit the murder. A few days later, Colson and his attorney met with police authorities. Colson made a full confession of his participation with Moulton in the crimes with which they were charged, and admitted to participating in other crimes as well. Colson also discussed with the police Moulton's inchoate plan to kill Elwell. The police offered Colson a deal under which no further charges would be brought against Colson in exchange for his agreement to testify against Moulton and otherwise cooperate in the prosecution of Moulton on the pending charges. Colson agreed.

As part of that agreement, Colson consented to wear a body transmitter to record what was said at a meeting between Colson and Moulton. The police knew that the express purpose of the meeting was for the two to discuss their planned defense at the approaching trial on the indicted offenses. At the meeting between the co-defendants, the police recorded a lengthy conversation during which Moulton expressly abandoned any plan to kill the witness Elwell, but, as expected, made numerous statements incriminating him in the already-pending charges, several of which were deliberately drawn out by Colson by claiming not to remember certain details and by reminiscing about other details of various crimes they had committed together. Moulton's recorded statements were later admitted into evidence against him at trial.

Molson was found guilty on the charges covered in the original indictments and several new charges as well. He appealed generally on the ground that the admission into evidence of his recorded statements to Colson violated his Sixth Amendment right to counsel. The Supreme Judicial Court of

Maine remanded for a new trial, holding that, as to the admission of Moulton's recorded statements to Colson, the prosecution could not use against Moulton at trial recordings of conversations where the state knew or should have known that Moulton would make incriminating statements regarding crimes as to which charges were already pending, regardless of whether the police had wired Colson for an admittedly legitimate purpose, *i.e.*, investigating threats against witnesses. It further determined that Moulton's statements might be admissible in the investigation or prosecution of charges for which, at the time the recordings were made, adversary proceedings had not yet commenced and the Sixth Amendment right to counsel had not yet attached. The United States Supreme Court granted the state's petition for certiorari, and affirmed the decision of the Supreme Judicial Court of Maine.

Justice Brennan, writing for the majority, framed the issue as follows:

> The question presented in this case is whether respondent's Sixth Amendment right to the assistance of counsel was violated by the admission at trial of incriminating statements made by him to his codefendant, a secret government informant, after indictment and at a meeting of the two to plan defense strategy for the upcoming trial.

*Moulton*, 474 U.S. at 161. In addressing this issue, the Court reviewed its holdings in *Massiah* and *United States v. Henry*, 447 U.S. 264 (1980), and rejected the state's contention that the decisive fact in those cases was that the police had set up the confrontation between the accused and a police agent. Justice Brennan wrote:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the state. As noted above, this guarantee includes the state's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or by happenstance—the state obtains incriminating statements from the accused after the right to counsel has attached. However, the knowing exploitation by the state of an opportunity to confront the accused without counsel being present is as much a breach of the state's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the state obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

474 U.S. at 176. Applying that principle to the facts of the case, the *Moulton* decision noted that the police suggested to Colson that he record the conversation during his meeting with Moulton and arranged for the recording, knowing that Moulton and Colson were meeting for the express purpose of discussing *pending charges* and planning a defense to those charges. The Court found that, by concealing the fact

that Colson was an agent of the state, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment.

The Court expressly reaffirmed its holding in *Massiah*, regarding the propriety of "continu[ing] an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted." *Id.* at 178. The holding in *Moulton* was expressly limited to its facts: "All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." *Id.* In a footnote, the *Moulton* Court added: "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 180 n.16.

In other words, the Court's holding applied specifically to a situation in which (1) an indicted defendant was put in a position where the police knew or should have known that he would make incriminating statements to a police agent regarding the crimes for which he had already been indicted; (2) the indicted defendant actually did make directly incriminating statements about the crimes with which he had been charged already; and (3) the defendant's directly incriminatory statements were used against him in the trial for the already-indicted crimes. The fact that the police had a legitimate basis for investigating the defendant's alleged plan to kill state witnesses did not alter the fact that the police also knew the meeting between Moulton and Colson was specifically for the purpose of discussing their defense to the already indicted charges.

The factual scenario in *Moulton* clearly differed in at least two important respects from that in March's case. Specifically, in March's case: (1) there was no indication that the police knew or should have known that the recorded conversations between Farris and March would yield evidence that would directly incriminate March in the murder of Janet Levine, and (2) the evidence obtained by the confidential informant, in fact, was not directly incriminating as to the murder charge. Thus, this case presents issues the Supreme Court was *not* specifically called to decide in *Moulton*: whether an indicted defendant's voluntary statements about a separate offense for which he has not been formally charged are admissible, if relevant, in the trial of the indicted offenses, if the defendant was *not* placed in a position where the police knew or expected that he would make incriminating statements about the already-

indicted crimes, and the defendant actually did not make any statements pertaining specifically to the indicted crimes.

Thus, the State's representation in its response in opposition to March's habeas petition—that there is no controlling Supreme Court case law addressing the precise factual issue presented here—is not factually or legally incorrect. Moreover, to the extent March takes issue with the State's representation that "there was no clearly established federal law" for the state court to apply unreasonably on the basis that there exists case law from the First Circuit interpreting *Moulton* to apply to factual circumstances analogous to those here, *see United States v. Bender*, 221 F.3d 265 (1st Cir. 2000), the standard of review set forth in § 2254(d)(1) refers only to "clearly established" federal law "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit has explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

*Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4261.1 (2d ed. Supp. 1998)); *see also Harris*, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d).").

This Court finds the State's analysis in its response to March's habeas petition to be deficient insofar as it simply adopts wholesale the state court's reasoning, and then essentially does nothing more than rotely argue that the state court's decision did not involve an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence before the state court. Regardless, the fact that the State—and the Tennessee Court of Criminal Appeals—interpret *Moulton* differently than did the First Circuit in *Bender* does not mean the State's position in this case is "not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010). Moreover, it is not unreasonable for the State to attempt to draw a distinction between the facts in this case and in *Moulton*, and to argue that *Moulton* does not apply here.

The State did not ignore *Moulton* or *Bender* or fail to make this Court aware of those cases. In short, regardless of whether this Court ultimately disagrees with the State's position, that position is "reasonable under the circumstances," *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997), and does not constitute sanctionable conduct.

IV.     **CONCLUSION**

For the reasons set forth herein, March's amended motion for sanctions (ECF No. 53) is hereby **DENIED**. The Clerk is directed to terminate the first motion for sanctions (ECF No. 51) as superseded by the amended motion.

It is so **ORDERED**.

Kevin H. Sharp
United States District Judge