IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PERRY A. MARCH,                    )
                                   )
          Petitioner,              )
                                   )
v.                                 )          Case No. 3:12-cv-272
                                   )
DAVID SEXTON, Warden,              )          Judge Sharp
                                   )
          Respondent.              )


**MEMORANDUM OPINION**

Petitioner Perry A. March was convicted and sentenced by the Criminal Court for Davidson County, Tennessee in Nashville after a jury trial in 2006, and is presently an inmate at Northeast Correctional Complex in Mountain City, Tennessee. His *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus was initially filed in the United States District Court for the Eastern District of Tennessee, but was transferred to this district. This Court has jurisdiction. 28 U.S.C. § 2241(d).

For the reasons set forth herein, the Court finds that, under the demanding standard governing the review of a § 2254 habeas petition, the petitioner is not entitled to relief.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

A Davidson County jury found petitioner Perry March guilty of the offenses of second-degree murder, destruction of evidence, and abuse of a corpse, and judgment was entered against him on August 17, 2006. March was sentenced as a Range I, standard offender to twenty-five years' imprisonment for the murder conviction, five years for the destruction-of-evidence conviction, and two years for the abuse-of-a-corpse conviction. The trial court ordered the petitioner to serve his sentences for the latter two convictions consecutively to the murder sentence, and the sentence on the murder conviction was ordered to be served consecutively to a twenty-four year sentence entered in a different case for conviction of conspiracy to commit first-degree murder, for an effective sentence of fifty-six years. March was denied relief on direct appeal. *State v. March*, No. M2007-00053-CCA-R3-CD, 2011 WL

332327 (Tenn. Ct. Crim. App. Jan. 27, 2011). The Tennessee Supreme Court denied March's request for permission to appeal on July 14, 2011. March did not seek post-conviction relief in the state courts.

On February 3, 2012, March filed his *pro se* petition for the writ of habeas corpus (ECF No. 1) in the United States District Court for the Eastern District of Tennessee. The case was transferred to this Court as the appropriate venue. Shortly thereafter, the Court conducted a preliminary examination of the habeas petition and determined that it stated colorable claims for relief. Accordingly, the Court entered an order (ECF No. 8) directing the respondent to answer, plead or otherwise respond to the petition. Rule 4, Rules Gov'g § 2254 Cases. The respondent filed his answer to the petition on July 10, 2012 (ECF No. 33), along with a copy of the underlying state-court record (ECF Nos. 34–41, 45). March filed a reply brief on January 7, 2013. (ECF No. 78.) He also submitted a motion to amend his petition (ECF No.77) to omit grounds 4, 5, and 6, as March now concedes that these claims challenged state evidentiary rulings that are not reviewable by this Court, and a sentence-enhancement that was not exhausted in the state courts. March also submitted a motion for judgment on the pleadings (ECF No. 79), in which he simply states that he does not seek an evidentiary hearing and asks the Court to render judgment in his favor on the strength of the written record.

Upon consideration of the petition, the answer, and the expanded record, the Court agrees with the petitioner that an evidentiary hearing is not needed in this matter. The Court will dispose of the petition as the law and justice require. Rule 8(a), Rules Gov'g § 2254 Cases.

## II.    FACTUAL BACKGROUND

The Tennessee Court of Criminal Appeals, in the opinion affirming the judgment of the trial court, summarized the factual history in the state courts as follows:[1]

> The murder victim in this case was Defendant's wife, Janet March. Carolyn Levine, the victim's mother, testified that Defendant and the victim met while they were both students at the University of Michigan. The couple married on June 14, 1987, and were married when the victim disappeared on August 15, 1996. Ms. Levine identified Defendant at trial as her daughter's husband. Ms. Levine said that the victim, who was thirty-three years old when she disappeared, was five feet, three or four inches tall and

---

[1] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g., Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007) ("'In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1))).

weighed approximately one hundred pounds. At trial, Ms. Levine identified the victim from a photograph.

After graduation, Defendant and the victim moved to Nashville so that Defendant could attend Vanderbilt Law School. The Levines paid Defendant's law school tuition and supported the couple for three years while Defendant was in school. After graduation, Defendant joined a Nashville law firm. In July 1995, the victim and Defendant moved into a newly built house located at 3 Blackberry Road in Forrest Hills.

Ms. Levine said that the victim's son, Samson March, was born on August 27, 1990, and her daughter, Tzipora March, was born on May 17, 1994. Ms. Levine described the victim as a "very attentive" and "very nurturing" mother. Ms. Levine and the victim talked on a daily basis, and the victim never left town without providing Ms. Levine her itinerary and other pertinent information concerning the children's care and schedules.

Ms. Levine stated that she first became aware that the victim and Defendant were undergoing marital problems in 1993, but she did not feel the problems were insurmountable. Ms. Levine said that she had a good relationship with Defendant, and both Defendant and the victim came to her individually for advice. The couple went to marriage counseling in 1991 or 1992, and Defendant began to see a psychiatrist. The victim joined Defendant during his individual counseling sessions in 1996.

Ms. Levine said that the couple's situation deteriorated further. Defendant told Ms. Levine in the spring of 1996 that he was afraid the victim was going to divorce him and take the children away from him. The victim and Defendant began arguing in front of the children, and Ms. Levine told Defendant that he needed to leave the residence because the children were upset by the couple's arguments. Defendant found a house to rent, but he did not immediately move out of the marital residence. Ms. Levine said, however, that Defendant stayed in a hotel for approximately six to eight nights before the victim disappeared.

Ms. Levine planned to accompany the victim to her appointment with a divorce attorney on Friday, August 16, 1996. However, around midnight on August 15, 1996, Defendant called the Levines and told them that the victim had left the house after an argument. Ms. Levine said that to her knowledge, the victim had never done that before. Ms. Levine told Defendant to call her when the victim returned.

Ms. Levine talked to Defendant several times by telephone on August 16, 1996. During one conversation, Defendant said that one of his son's schoolmates had arrived for a play date, and Ms. Levine instructed Defendant to let the child play with Samson. Defendant told Ms. Levine that he had explained to the children and the children's part-time babysitter that the victim had left early that morning to work on a large art project.

Defendant told Ms. Levine that the victim had taken two small shopping bags, a small, gray suitcase, her passport, and $1,500 with her when she left. The Levines drove to the airport to search for the victim's vehicle but were unsuccessful. Defendant initially said that the victim was wearing khaki shorts and a navy short-sleeved, collarless top when she left, but later told Ms. Levine that the victim had changed into blue jeans before leaving.

Defendant said that the victim had handed him a typewritten note entitled "Janet's 12-day vacation" when she left which contained a list of chores for Defendant to do while the victim was gone. Ms. Levine stated that the victim often made lists, but they were always hand-written. When she helped Defendant put the children to bed on August 16, 1996, Ms. Levine noticed a yellow-lined legal pad by Defendant's computer in his office which contained a handwritten list of similar chores. Ms. Levine said that the words "two weeks" in Defendant's handwriting were circled at the top of the list. Ms. Levine stated

that the victim never used capital letters in her notes, and she dated the notes at the top of the page. Ms. Levine stated that the typed note entitled "Janet's 12 day vacation" used capitalizations and was dated at the bottom.

Ms. Levine initially believed Defendant's explanation for the victim's absence. By Sunday night, however, she grew increasingly concerned because the victim had never left the children before without telling someone where she was going. The Levines wanted to contact the police, but Defendant and his brother, Ron March, convinced them to wait for twelve days. Ms. Levine agreed because she still believed the victim would return, and Ms. Levine did not want to embarrass her by getting the police involved.

The victim had planned a birthday party for her son for Sunday, August 25, 1996, and the invitations had been mailed before the victim's disappearance. Ms. Levine found it "unbelievable" that the victim would not return for her son's birthday party which went on as planned. Ms. Levine stated that Samson started school on the following Monday, August 26, 1996, and the victim had planned to take cupcakes to her son's classroom on his birthday on August 27, 1996. Ms. Levine found it "inconceivable" that the victim would miss these events in her child's life.

Ms. Levine said that Defendant's father, Arthur Marsh, who lived in Mexico, came to Nashville to attend Samson's birthday party, but he left the next day for Chicago. Defendant explained, "My dad has a big mouth, he tells everything." Ms. Levine said that around this time, Defendant also said, "[T]hat f——ing Janet has ruined my life." Ms. Levine was "shocked and horrified" because Defendant had never used this kind of language in front of her before.

The Levines told the police about the victim's disappearance on August 29, 1996. The victim's grey Volvo was found backed into a parking space at the Brixworth Apartments on September 7, 1996. At trial, Ms. Levine identified the vehicle as the victim's from a photograph. The victim's purse, three dresses, two pairs of shorts and a child's car seat were in the vehicle. A gray suitcase which Defendant told Ms. Levine the victim was carrying when she left was not in the car.

Ms. Levine stated that Defendant's demeanor and attitude changed after the victim's vehicle was found. Ms. Levine was concerned about the children during this period, and she and Defendant spoke with a child psychologist for guidance in answering the children's questions about the victim. Defendant was angry, however, when Ms. Levine spoke to one of Samson's teachers, and he told Ms. Levine not to call the school again.

Ms. Levine stated that Defendant took the children to Chicago for Rosh Hashana on Saturday, September 14, 1996. Arthur March remained in Nashville because Defendant said that it was too expensive for his father to travel to Chicago. Defendant and the children returned home on September 15, 1996, but Defendant would not let Ms. Levine see the children. Defendant later moved to Chicago with the children. Ms. Levine said that she next saw the children in Chicago in December 1996, after she and Mr. Levine petitioned the court for grandparent visitation rights. During a second court proceeding concerning visitation, Ron March, who represented Defendant, informed the trial court that Defendant had moved to Mexico with the children. Ms. Levine testified that she and her husband, as well as the trial judge and the children's guardian *ad litem*, were all surprised by this announcement.

Ms. Levine said that a memorial service for the victim was held on November 17, 1996, but Defendant did not attend. Ms. Levine stated that the victim primarily used a Visa credit card, and Defendant used a MasterCard credit card. Neither credit card was used by the victim after her disappearance, but Defendant used both the Visa and the MasterCard after August 16, 1996. Ms. Levine stated that Defendant owned a mountain

bike at the time of the victim's disappearance and described Defendant "as an avid mountain biker."

Ms. Levine said that Defendant moved his personal property to Chicago, and the victim's personal items were stored in the garage of the Blackberry Road house after it was sold. Ms. Levine began to sort through the items in early 1997. One of the movers found an envelope with the logo of a company with whom the victim did business, and with the victim's name handwritten on the flap of the envelope. Ms. Levine stated that the envelope contained two typewritten letters. After briefly reading a portion of one of the letters, Ms. Levine called the police.

John Ritchie testified that he worked for a cabinet company in August 1996. On August 15, 1996, he and John McAllister installed two butcher block counter tops in the victim's residence. The two men arrived at the victim's house at approximately 4:00 p.m. Mr. Ritchie said that a Volvo and a Jeep were parked in the driveway. Mr. Ritchie talked with the victim, who knew Mr. Ritchie's family, while the counter tops were being installed. The victim asked the men to also tighten the kitchen faucet, and Defendant, who had entered the kitchen through the back door, handed Mr. McAllister a pair of pliers.

Deneane Beard testified that she cleaned the March residence from 1994 until 1996 while she was in nursing school. Ms. Beard said that she normally worked one day a week, either in the morning or in the afternoon, depending on her school schedule. The victim left Ms. Beard handwritten notes outlining the chores that needed to be done that day. Ms. Beard was scheduled to work at the March residence on Friday, August 16, 1996. Defendant called Ms. Beard before she left for work to find out what time she would arrive at the residence and told Ms. Beard that the victim had gone to California on a business trip. Ms. Beard arrived at the house between 8:00 a.m. and 8:30 a.m. and found that the house had already been cleaned.

Ms. Beard stated that she continued to work for Defendant until approximately September 16 or 17, 1996. On her last day, police officers knocked on the front door. Ms. Beard let the officers into the house and then continued cleaning. Ron March, who was at the house that day, asked her to "hurry things up." Mr. March had a telephone conversation and then told Ms. Beard she should leave. Mr. March escorted Ms. Beard to her car while holding on to her arm. Ms. Beard said that Arthur March was not present that day although she had seen him at the house before.

Marissa Moody testified that in 1996 her son attended the same preschool as Samson March. On August 15, 1996, Ms. Moody and the victim arranged a play date for the two boys for the following day. Ms. Moody arrived at the victim's house on August 16, 1996, between 9:30 a.m. and 10:00 a.m., and Samson answered the door. Ms. Moody did not see the victim, but Defendant came out of his office in response to the door bell. Ms. Moody said that Defendant was surprised because he did not know about the play date. Ms. Moody stated that a rolled up oriental rug was in the middle of the floor in the entry hall, and Samson was jumping up and down on the rug. Ms. Moody picked her son up at approximately 2:00 p.m., but Defendant was not home.

Laura Zinker testified that she met the victim in 1988, and the two women became close friends. The victim visited Ms. Zinker in the summer of 1996 and told Ms. Zinker about her marital problems. On cross-examination, Ms. Zinker said that she never saw any sign of physical abuse, but on redirect examination, Ms. Zinker stated that she had observed instances where Defendant verbally abused the victim. Ms. Zinker said that Defendant was "very critical" of the victim and demeaning of her intelligence.

Laurel Rummel testified that she had known the victim since she was eight years old. Ms. Rummel spoke to the victim by telephone on the morning of August 15, 1996, and

the victim sounded hurried and "a little distracted." Defendant called Ms. Rummel at approximately 10:00 p.m. on August 15, 1996, and told Ms. Rummel that the victim had packed a bag and left the house. Ms. Rummel had previously made an appointment to meet Defendant on August 16, 1996, to discuss the purchase of carpeting for his new law office. Ms. Rummel stated that Defendant kept the appointment but "was very troubled, very worried about where [the victim] was, when she would come home, and he seemed pale and shaken up."

Diane Saks testified that she had known the victim all of Ms. Saks' life. She described the victim as a protective and loving mother. Ms. Saks said that Defendant called her after he moved to Chicago. During one conversation, Defendant asked Ms. Saks if she thought he had killed the victim. Ms. Saks was surprised by the question. Defendant asked Ms. Saks if she could believe that he put the victim in the back of his vehicle, leave the children home alone while they were sleeping, and then return and pretend "like nothing ever happened." Ms. Saks' husband took the receiver from her and asked Defendant not to call any more.

Dr. Thomas W. Campbell, a psychiatrist, testified that Defendant was his patient from November 1992 until March 1995, and then again from July 1996 to September 1996. Dr. Campbell said that the victim accompanied Defendant to some of the 1996 counseling sessions, and he last met with both Defendant and the victim on approximately August 5, 1996. Dr. Campbell described the session as "volatile," and he suggested that Defendant and the victim try a trial separation "so they could calm down."

On cross-examination, Dr. Campbell said that in one of the last sessions, the victim asked Defendant during a heated exchange if he had told Dr. Campbell about the incident at his former law firm. Dr. Campbell stated that the incident "was not a big deal on [Defendant's] radar screen," but the victim was very angry when she asked the question. On redirect examination, Dr. Campbell stated that Defendant told him that he had to leave his former law firm because of conflict with someone in the firm. Defendant did not tell Dr. Campbell any of the details surrounding the incident.

Dr. Stacey Ann Goodman testified that she met the victim and Defendant at the University of Michigan in 1981, and she and another friend arranged a date between Defendant and the victim. Dr. Goodman and the victim became roommates in the spring of 1982. Dr. Goodman stated that she frequently rode with the victim in the victim's vehicle and that she never saw the victim back into a parking space. Dr. Goodman moved to Nashville in 1987 for her residency at Vanderbilt University Medical Center and resumed her friendship with the victim and Defendant. Dr. Goodman was interviewed by the media about the victim's disappearance in January 1997. Defendant telephoned Dr. Goodman from Chicago either the day of or the day after the interview. Dr. Goodman stated that Defendant was very angry. He screamed and swore at her and told Dr. Goodman that he would "get" her when he came to Nashville. Dr. Goodman said that she was scared and upset after the telephone conversation, and she filed a report with the Metro Nashville Police Department about Defendant's threat.

Ella Goldshmid testified that she worked as a part-time babysitter for the victim's children for approximately six years before the victim's disappearance. The victim always notified Ms. Goldshmid when she planned to travel, and Ms. Goldshmid would help Ms. Levine care for the children in the victim's absence. Ms. Goldshmid said that when the victim went away, she left "very explicit instructions" concerning the children's care and schedules which were either handwritten or dictated to Ms. Goldshmid to write down.

Ms. Goldshmid said that in August 1996 she worked for the victim on Wednesdays and Fridays. The victim was not acting like herself when Ms. Goldshmid arrived at the victim's residence on August 14, 1996. Ms. Goldshmid described the victim's face as "grey, stone-like." Ms. Goldshmid said that the victim would usually chat with her for a few

minutes after she arrived. On August 14, 1996, however, the victim told Ms. Goldshmid that she was very busy and needed to work on the computer. The victim went into her office and closed the door, and Ms. Goldshmid did not see the victim for the remainder of the day. Ms. Goldshmid said that the victim did not normally use the computer, and it was the first time Ms. Goldshmid had ever seen the victim work on the computer all day.

Ms. Goldshmid arrived for work on August 16, 1996, between 9:30 a .m. and 10:30 a.m. Defendant told Ms. Goldshmid that the victim had flown to California to visit her brother, Mark Levine. Ms. Goldshmid stated that it was unusual for the victim to leave town without telling her. Ms. Goldshmid said that a rolled up rug was blocking the door leading to the kitchen. She did not know where the rug came from, and she never saw it again after that day. Ms. Goldshmid last stayed with the March children on September 8, 1996. Defendant did not tell Ms. Goldshmid that he was moving to Chicago with the children.

Tim Mason, a detective with the Metro Nashville Police Department, testified that he was notified on September 7, 1996, that the victim's Volvo had been found in the parking lot of the Brixworth Apartments. The locked Volvo was backed into a parking spot at the rear of the apartment complex approximately two hundred yards from the main road. Detective Mason identified the victim's vehicle from a photograph at trial.

David Miller testified that in 1996 he was a detective with the Metro Nashville Police Department assigned to the investigation of adult missing persons. Detective Miller said that Carolyn and Lawrence Levine came to the police department on August 29, 1996, to report the victim's disappearance. Detective Miller performed routine searches of area hospitals and other locations, the victim's credit cards, and the victim's bank accounts, but he did not discover any information concerning the victim's whereabouts. Detective Miller took Defendant's statement on September 10, 1996, at the Levines' residence. Detective Miller stated that Defendant appeared nervous. Detective Miller advised Defendant of his Miranda rights and told him that he had the right to refuse to consent to a search of his residence. Defendant told Detective Miller that he was an attorney and understood his Miranda and Fourth Amendment rights. Defendant wrote out his statement by hand. In his statement, Defendant said that on August 15, 1996, he and the victim had a conversation after the children had gone to bed. Defendant stated that the victim grew "frustrated" and "upset," but he remained calm. Defendant called a local hotel and booked a room, but the victim said that "she had a different idea tonight." The victim typed something on the computer and then went upstairs. When she came downstairs, she had three small bags with her. The victim handed Defendant her "12-Day Vacation Note" and told him to sign it which Defendant did. The victim said something like "Your turn, see ya, [sic]," and left the house.

On September 16, 1996, Detective Miller told Defendant's attorney that he intended to execute a search warrant for Defendant's computer on the following day. Detective Miller arrived at Defendant's residence on September 17, 1996 and discovered that the hard drive from Defendant's computer had been ripped out.

Brad Corcoran, a detective with the Metro Nashville Police Department, testified that he processed the victim's Volvo. The exterior of the Volvo was covered with dirt, dust, and pollens, there were cobwebs in the wheels, and rust was present on the disk brakes, all of which indicated that the Volvo had not been moved for a significant period of time. A purse containing the victim's identification was found in the pocket of the left front door, and a child's car seat was in the backseat behind the driver's seat. A black suitcase containing clothes and a canvas bag containing toiletry items were also in the Volvo. The front passenger seat was pushed back, and the driver's seat was positioned closer to the steering wheel. A fifty-dollar bill was in the glove compartment, and the purse contained eleven dollars in cash, various credit cards, and the victim's passport. A pair of white shoes was on the floor in front of the driver's seat. Detective Corcoran also processed

Defendant's Jeep on September 12, 1996, and found two fibers and a hair in the backseat. Detective Corcoran lifted latent fingerprints from both vehicles. On cross-examination, Detective Corcoran said that the Jeep did not appear to have been cleaned before it was processed, but he detected an order of some type of cleaner or disinfectant when he opened the rear door.

Kim Garbler testified that she was an employee of the private investigation company that was hired by Mr. Levine on September 7, 1996, to assist in the investigation of the victim's disappearance. Ms. Garbler interviewed Defendant at the beginning of the investigation and thought it unusual that he referred to the victim in the past tense. Ms. Garbler began interviewing the residents of Brixworth Apartments to determine if anyone had seen the Volvo in the apartment complex's parking lot. Ms. Garbler stated that Defendant was angry when he learned what she was doing. Defendant telephoned Ms. Garbler and demanded that she fax him a list of everyone she had spoken to and what they had said by the end of the day. Defendant then hung up the telephone.

Peter Rodman, a flight attendant for an international airline company, testified that he lived at Brixworth Apartments in 1996, but he was frequently out of town. Mr. Rodman said that he returned home at approximately 1:00 a.m. on August 16, 1996. As he pulled into the parking lot, Mr. Rodman noticed that a man, wearing a jogging suit, was slowly walking a bicycle down the middle of the parking lot. Mr. Rodman parked his vehicle and opened the back door to retrieve some items. When he turned around, he noticed that the man was "frozen in place" and appeared shocked. Mr. Rodman said that he was approximately ten to twelve feet from the man, and the parking lot was well lit. Mr. Rodman saw Defendant's photograph in a news article about the victim's disappearance in February 1997. Mr. Rodman called Detective Mike Smith with the Metro Nashville Police Department and told him about the incident. Mr. Rodman identified Defendant at trial as the man with the bicycle.

Travis West, a manager for Cumberland Transit, a bicycle shop in Nashville, testified that a mountain bicycle differed from a road bicycle in that a mountain bicycle had a smaller frame and wheels and weighed between twenty-five to thirty-two pounds. Mr. West said that the bicycle shown with Defendant in the photographs introduced as exhibits 3A and 3B was an older model mountain bike. Mr. West said that he was able to put his own mountain bicycle inside his Honda Civic by removing the front wheel with a "quick release" mechanism. Mr. West stated that it took between approximately five and fifteen seconds to remove the front wheel and the same amount of time to reattach the front wheel to the bicycle. Mr. West also said that a mountain bicycle could be placed in the front seat of his parent's Volvo, which was similar in size to that of the victim's vehicle, after the front wheel was removed. Mr. West stated that the dirt reflected in the photograph of the victim's front passenger floorboard appeared to be consistent with a tire or part of a bicycle resting there.

Bill Pridemore, a detective assigned to the homicide section of the Metro Nashville Police Department, testified that he submitted certain fibers and a hair sample found in Defendant's Jeep to the Federal Bureau of Investigation ("FBI") for analysis. Detective Pridemore also submitted a hair sample found in Defendant's Jeep and hair samples from the victim's hairbrush to Orchid Cellmark Labs for DNA testing. The parties entered an agreed stipulation into evidence stating that the mitochondrial DNA analysis of the hair sample recovered from the cargo area of Defendant's Jeep was consistent with the victim's DNA profile.

Karen Korsberg testified that she is employed as an examiner in the FBI's trace evidence unit in the laboratory in Quantico, Virginia. Ms. Korsburg [sic] examined three samples of debris collected from the Defendant's Jeep for the presence of carpet fibers. Ms. Korsburg explained that carpet fibers are generally courser or larger than fibers in clothing and may have specific shapes. Ms. Korsburg said that the sample taken from the

Jeep's front trunk area contained blue, grey, and green round carpet type fibers; a reddish orange trilobel carpet type fiber; a pink trilobel carpet type fiber, and an off-white carpet type fiber. The sample taken from the back of the Jeep's trunk area contained a reddish orange trilobel carpet type fiber, a pink trilobel carpet type fiber, and a light grey or blue trilobel carpet fiber. The sample taken from the Jeep's front and back seats contained reddish orange trilobel carpet-type fibers, light blue trilobel carpet-type fabrics, a grey, round carpet type fiber, and an off-white trilobel carpet type fabric.

Annette Noel Hall testified that in 1996 she was employed by WSMV Channel 4, an NBC affiliate. Excerpts from Ms. Hall's 1996 interview of Defendant were played for the jury. In those excerpts, Defendant denied that he and the victim fought during the evening of August 15, 1996, and described it as a "relatively benign evening." Defendant denied removing the hard drive from the computer located at his residence and said it was as much "an enigma" to him as it was to the police. Defendant said that he would not allow the investigating officers to interview his son because Samson was asleep when the victim left the house on August 15, 1996, and did not know anything about the victim's disappearance.

Redina Friedman testified that she practices family law in Chicago, Illinois and is a certified child representative with the Cook County Court System. Ms. Friedman was appointed guardian *ad litem* to the March children in March 1999 after the Levines filed a petition requesting visitation rights with the children. Ms. Friedman interviewed the children at their home in Chicago and was concerned with the absence of any photographs or other reminders of the victim. Ms. Friedman said that Defendant opposed granting the Levines visitation rights because he was concerned that they would allow the police and the news media to interview his son. Defendant told Ms. Friedman that Samson "knew absolutely nothing" about the victim's disappearance, and that he did not see or hear anything on the night she left. Ms. Friedman stated that the children had a close relationship with their grandparents, and despite Defendant's concerns, Ms. Friedman filed a written report with the court recommending that visitation be granted. After the report was filed, Defendant became "openly hostile" to Ms. Friedman and told her that "he could disappear in Singapore and no one would ever see them again."

Mark Levine, the victim's brother, testified that he returned home from California when he learned of the victim's disappearance. One day when Defendant was at his parent's home, Mark Levine asked Defendant if he could see the note entitled "Janet's twelve-day vacation" which was saved on Defendant's computer. The two men left in separate vehicles, and Defendant drove away first at a fast rate of speed. Mark Levine followed Defendant but fell behind when Defendant ran a red light. When he arrived at Defendant's house, the door was locked. Mark Levine rang the door bell several times before Defendant opened the door. Defendant had already turned on the computer. While reading "Janet's 12-day vacation" note, Mark Levine noticed another document in the computer which appeared to be a list by the victim of incidents where Defendant mistreated her. The list was six pages long, single-spaced, and with no paragraph indentations. Defendant initially said that Mark Levine could print off a copy of the document. Mark Levine said that he did not know how to print from Defendant's computer. Defendant did not explain how to use the print function, and Mark Levine never obtained a copy of the list.

Mark Levine said that he, his parents and Defendant were sitting on the Levines' patio when Detective Miller arrived shortly after the victim's disappearance had been reported to the police. Mark Levine stated that Defendant "just turned white when he saw that car and he started shaking, just overwhelmingly shivering, because I remember he tried to stand up twice and fell back in his chair twice he was shaking so much." Defendant asked Mark Levine to call his brother, Ron March. Mark Levine delayed placing the call and then left a message on Ron March's answering machine. On cross-

examination, Mark Levine acknowledged that the computer showed that the "12-day vacation note" was saved at 8:15 p.m. on August 15, 1996.

Leigh Reames testified that in 1991 she worked as a paralegal in the same law firm as Defendant. Ms. Reames stated that she received three anonymous letters which contained sexual references. Ms. Reames turned the letters over to her supervisor, and, after an internal investigation, it was determined that Defendant had written the letters. Ms. Reames felt uncomfortable working for the firm and resigned. An out-of-court settlement agreement was reached in which Defendant agreed to pay equal monthly payments until the forty-eighth installment when a balloon payment of $12,500 was to be paid. Ms. Reames stated that she never received the balloon payment which was scheduled to be paid in early 1996. Instead, she received a letter from Defendant dated August 13, 1996, and postmarked August 16, 1996, in which Defendant told Ms. Reames that he would be able to make the balloon payment in October 1996. Ms. Reames testified that the two typewritten letters found in the envelope among the victim's possessions by Ms. Levine in early 1997 were the originals of the second and third letters she had received from Defendant in 1991. Ms. Reames stated that letters she received in 1991 were only copies of the originals.

Jon Jones testified that he represented the Levines in litigation involving the property of the victim's estate. Mr. Jones took Defendant's deposition in October 1996 in connection with this civil litigation. A redacted video of the interview was introduced as an exhibit and played for the jury at trial. In his interview, Defendant generally relayed the same information contained in his statement to the police. Defendant acknowledged that the victim was upset with him on August 15, 1996, but said it was just "normal tension." Defendant stated that he did not believe that his prior contact with Leigh Reames was a problem on August 15, 1996. Defendant said that the victim knew about the incident and the settlement agreement. Defendant said he believed he and the victim last discussed the issue in June or July 1996, including Defendant's plan to pay off the balance of his debt. Defendant acknowledged that he executed a will in September or October 1996 in which he changed the beneficiary from the victim to the children and appointed his brother, Ron March, as administrator and guardian of the children.

Michael Levine, the victim's first cousin, testified that he served as the victim's and Defendant's insurance agent prior to the victim's disappearance. In October 1994, the Marches purchased a $250,000 term policy on the victim's life with Defendant as beneficiary. Defendant also had a life insurance policy in the face amount of $400,000 with the victim as beneficiary. In January 1997, Michael Levine received a copy of a letter which Defendant had sent to the insurance company asking that Michael Levine be removed as his insurance agent. Michael Levine said that the beneficiary of the victim's life insurance policy was changed from Defendant to the victim's estate, with the children as contingent beneficiaries, by the probate court, and the insurance proceeds were paid in trust to the probate court in 2003.

Sherri Lee, a beautician, testified that she cut both the victim's and Defendant's hair in 1996. Ms. Lee said that she was cutting the victim's hair in July 1996 when Defendant entered the salon. He approached the victim, and the victim seemed nervous "and she sort of [cowed] away a little." Ms. Lee had never observed the victim act that way around Defendant. Ms. Lee said that Defendant had an appointment scheduled for August 22 or August 23, 1996. Ms. Lee did not know the victim was missing at that time. Ms. Lee went to greet Defendant who was accompanied by a woman. Defendant said, "Janet is not here but her best friend so and so [sic] . . . is." Ms. Lee could not remember the woman's name.

Jose Alberto Sandoval Pulido testified that he had practiced law in Guadalajara, Mexico since 1998. Mr. Pulido, his client, Samuel Chavez, and Defendant had a business meeting in Mexico in 2001. Defendant became very angry with Mr. Pulido and Mr.

Chavez toward the end of the meeting, and Mr. Chavez and Defendant traded insults. Mr. Pulido stated that Defendant "said that if we did not help him he would do away with us the way he did with his wife." Mr. Pulido and Mr. Chavez left the meeting.

A videotape of Arthur March's deposition which was taken before trial was played for the jury. In his deposition, Mr. March testified that he had entered a plea of guilty in federal court to solicitation to commit murder. Mr. March acknowledged that the Levines were the intended victims of the charged offense. Mr. March was sentenced to eighteen months confinement followed by three years of supervised probation in exchange for his truthful testimony at Defendant's murder trial. Mr. March said that he arrived in Nashville three or four days after the victim disappeared to help Defendant with the children and to attend Samson's birthday party. When he arrived in Nashville, Defendant asked him to dispose of his computer's hard drive and another component of the computer. Mr. March threw the hard drive away in a wooded area, and the other component in a dumpster. Defendant then asked his father to help him dispose of the victim's remains. Mr. March said that he bought a shovel and a bottle of Clorox at a hardware store near Interstate 65. He and Defendant drove to a road near a construction site on property previously owned by Sharon Bell. Mr. March got out of the car, and Defendant drove away. Mr. March followed Defendant's directions by walking ten or fifteen yards and turning left and found the victim's remains in a leaf bag in the spot described by Defendant. Mr. March brushed the dirt off the top of the bag and closed it. He pulled the bag down the hill and waited for Defendant by the side of the road. Defendant drove up, and Mr. March and Defendant put the victim's remains in the trunk. Mr. March stated that he saw some bones in the bag, and the bag weighed approximately fifty or sixty pounds.

Defendant drove north toward Chicago. Defendant stopped at a motel near Bowling Green, Kentucky and Mr. March paid for a room with Defendant's cash. Defendant told his father that he was tired and laid down on the bed. Mr. March took Defendant's car keys and drove to the other side of Bowling Green. He looked for a creek but could not find one that was deep enough to hide the victim's remains. Mr. March pulled to the side of the road as the sun began to rise and noticed a large pile of brush. He cleared away three holes in the brush, and he placed the victim's clothes in the first hole, the victim's remains in the second hole, and the trash bag in the third hole. Mr. March then drove back to the motel, and he and Defendant returned to Nashville. Mr. March said that he and Defendant never discussed the incident again.

Regarding the solicitation of the murder of the Levines, on cross-examination, Mr. March acknowledged that Mr. Farris, whom he knew as "Bobby Givings," telephoned him in Mexico. Mr. March said that Defendant told him that Mr. Farris was "a friend who needed some help." Mr. Farris used code words during the first telephone call so that Mr. March would know that Defendant had approved the call. Mr. March initially said that it was his idea to murder the Levines. Subsequently, he stated that Mr. Farris suggested the plan. Mr. March said that he never discussed with Defendant the details of his telephone conversations with Mr. Farris. Mr. March acknowledged, however, that Mr. Farris told him to send information concerning their conversations to Defendant's sister in Chicago who would download the messages and mail them to Defendant. Mr. March acknowledged that he and Mr. Farris discussed the Levines' schedule, and the plan for Mr. Farris to come to Mexico after the offenses were committed. Mr. March said that he understood from Defendant that he, Mr. March, was to support Mr. Farris in the commission of the offenses.

The taped telephone conversations between Mr. March and Mr. Farris were introduced as exhibits at trial and played for the jury. The two men discussed the daily schedules of Defendant's children and the Levines, the purchase of a gun to commit the offenses, the type of gun to use, and the plan for Mr. Farris to live with Mr. March in

Mexico after the offenses. Mr. March warned Mr. Farris to "wear thin surgeon's gloves," and told him, "You do not take them off at all."

Fletcher Bailey Long testified that he represented Arthur March after his indictment in Tennessee for conspiracy to commit first-degree murder, and his indictment in federal court for conspiracy to commit interstate murder-for-hire. Mr. Long said that he and Mr. March were discussing a possible settlement agreement on February 1, 2006, when Defendant entered the room. Defendant said, "Dad, don't roll on me, I'm not going to roll on you." Mr. Long said that Defendant held out his jail jumpsuit and said, "We will wear this as a badge of honor, a badge of honor."

Dr. William M. Bass, a professor emeritus of the University of Tennessee, was allowed to testify as an expert in the field of forensic anthropology. Dr. Bass explained that various factors affect the rate of a body's decomposition including temperature, exposure to sun, and the place the body was buried. Dr. Bass was provided a hypothetical situation in which the body of a one hundred pound, five feet, three inches tall woman is placed in a large leaf bag, open on one end, which is then deposited in a wooded area, lightly covered with dirt, leaves, or debris and not removed for approximately thirty-nine days. Dr. Bass stated that based on those conditions, the decaying process would start on the fifth day and last between fifteen to twenty days. Dr. Bass said that the body would be a skeleton by the end of the third or fourth week, and the bones would weigh between ten and fifteen pounds.

Robert Armstrong, the co-owner of a tire store in Nashville, testified that he sold a set of Michelin tires to Defendant on August 21, 1996, for Defendant's Jeep Cherokee. Before he rang up the sale, Mr. Armstrong inspected the Jeep and discovered that the tires "were in extremely good shape." Defendant told Mr. Armstrong that he wanted Michelin tires instead of the ones currently on the Jeep. Defendant told Mr. Armstrong that he did not want to keep the old tires.

Andrew Saks, a friend of Defendant and the victim, testified that Defendant asked Mr. Saks to help him move on September 18, 1996. Mr. Saks said that Defendant "was very business like and somewhat aggravated" during the move. Mr. Saks said that Defendant's comments "that he wanted to 'F' [sic] the Levines and 'F' [sic] the Nashville police" were "very disturbing." Mr. Saks stated that Defendant did not take up his offer to help Defendant search for the victim.

Robert Heller testified that he has known Defendant since October 1993. In 1997, Defendant asked Mr. Heller to critique a manuscript Defendant had written. The manuscript, which was introduced as an exhibit at trial, portrayed the investigation of the murder of a young, black-haired woman.

Russell Nathaniel Farris testified that he was currently housed in the Davidson County Criminal Justice Center on three counts of attempted first degree murder, one count of aggravated robbery, and one other felony offense not identified in the record. Mr. Farris acknowledged that he had four prior convictions of theft, one conviction for facilitation of robbery, one conviction for reckless endangerment, and one misdemeanor theft conviction. Mr. Farris agreed that he was facing a significant amount of time in confinement if convicted of the pending charges.

Mr. Farris said that he was arrested on his current charges at the end of April 2005 and transferred to the Special Management Unit on the fourth floor of the Criminal Justice Center at the end of May. Defendant arrived on the fourth floor in August 2005. Mr. Farris said that Defendant came over to talk to him on Defendant's first night in the unit. Defendant asked Mr. Farris about prison life, and Defendant talked about living in Mexico. Mr. Farris stated that Defendant's erroneous belief that Mr. Farris had been charged with first degree murder was because of a computer error.

Mr. Farris said that Defendant would talk to him through a crack in Mr. Farris's cell door during Defendant's recreation period. After numerous conversations, Mr. Farris said that Defendant asked him to kill Carolyn and Lawrence Levine. Defendant told Mr. Farris that he would pay his bond so that Mr. Farris could be released from jail. Defendant intended to raise money for Mr. Farris's bond by selling property in Mexico or possibly through a cash advance for the publication of his manuscript.

Mr. Farris stated that he and Defendant talked on a daily basis for approximately one month. Mr. Farris became concerned that he would be charged with conspiracy, and he told his attorney and mother about his conversations with Defendant. Mr. Farris's attorney scheduled a meeting with police officers and the district attorney general's office after which Mr. Farris agreed to record his conversations with Defendant. Mr. Farris recorded several conversations with Defendant in which the murder of the Levines was discussed. Mr. Farris then told Defendant that he was going to be released on bond. Instead, Mr. Farris was taken to the Williamson County jail. The tape of the recorded conversations was entered as an exhibit at trial and played for the jury.

Before Mr. Farris' transfer, Defendant wrote down a list of code words Mr. Farris was to use when he contacted Arthur March, and gave Mr. Farris Mr. March's telephone number in Mexico and his e-mail address. Defendant wrote the Levines' address at the bottom of the page. After his transfer to Williamson County, Mr. Farris called Arthur March in Mexico approximately five times concerning the plan to murder the Levines.

On cross-examination, Mr. Farris said that when he was supposedly ready to commit the murders, he would tell Arthur March that he was ready "to buy the BMW." Arthur would relay the information to his daughter in Chicago who would then e-mail the information to Defendant. Mr. Farris said that he used the name, "Bobby Givings", when he spoke to Arthur March. Defendant told Mr. Farris, however, that Mr. Farris was to postpone killing the Levines if Defendant got word to Mr. Farris through Arthur March that he was "not ready to sell." Defendant said that it was important for both him and Mr. Farris to be in agreement on the timing of the offenses.

Cornelius King testified that he was arrested in Nashville on October 19, 2005, for first degree murder, and he was housed in the Special Management Unit on the fourth floor of the Davidson County Criminal Justice Center. Defendant's cell was next to Mr. King's cell. Defendant talked to Mr. King when Defendant was released from his cell for recreation. Defendant talked about his children, his father, and living in Mexico. During one conversation, Defendant told Mr. King that he and the victim had argued over Defendant's infidelity. Defendant said that the victim told him that she was going to obtain a divorce and "take everything." Defendant told Mr. King that he "was not going to allow it to happen." The argument escalated into a physical altercation, and Defendant said that he struck the victim on the head with a wrench. Defendant told Mr. King that he would win his case because he had burned the victim's body and poured the ashes in the lake.

In January 2006, Mr. King was moved to the third floor but was shortly returned to the fourth floor after a confrontation with his co-defendant. Mr. King said that Defendant was suspicious of him after Mr. King returned to the Special Management Unit. Defendant asked Mr. King if he had returned to the fourth floor to elicit more incriminating evidence about Defendant. Mr. King wrote down the substance of the prior conversations with Defendant about the victim's death and passed the note to his lawyer. Mr. King said that Defendant asked him to testify in court against another prisoner, Reno Martin, and Defendant would tell him what to say. Mr. King refused. Defendant then filed a grievance against Mr. King alleging extortion, and Mr. King was moved off the fourth floor.

Reno Martin testified that in October 2005, he was housed at the Criminal Justice Center in the Special Management Unit on the fourth floor following his arrest on a drug charge. Mr. Martin said that his cell was next to Defendant's cell, and Mr. Farris' cell was

on the other side. Mr. Martin and Defendant became friends. One day, while the men were taking their recreation on the roof, Mr. Martin noticed that Defendant was "very agitated." Defendant had attended a court proceeding earlier that day concerning the custody of his children. Defendant told Mr. Martin that "it was times like this that he was glad that he wasn't [sic] out with a gun." Mr. Martin stated that Defendant also said "that it should have been them that he had taken care of instead of . . ." Defendant stopped talking before he finished his sentence and "lost his expression on his face." Mr. Martin stated that Defendant "went completely pale, like he couldn't [sic] believe what he just said to me." Mr. Martin said that Defendant "kind of had the deer in the headlight look."

Mr. Martin told federal officers that he believed that Defendant had hired Mr. Farris to kill the Levines. Mr. Martin said that Mr. Farris and Defendant were having private conversations and acting "very secretive." Defendant and Mr. Farris would stop talking if anyone walked by. On one occasion, Mr. Martin overheard Defendant ask someone in an agitated voice on the telephone why some money had not been transferred. Defendant hung up and placed another call. Defendant gave the person on the other end an account number and said that he was to be sure that the money got transferred.

Mr. Martin and Defendant discussed Mr. Farris' release on bond. Defendant said that he thought Mr. Farris might show up for one court date, but he did not think that Mr. Farris would attend any court dates after that. Defendant said that there was "no telling what [Mr. Farris] might do once he got out and what he might say [Defendant] put him up to." Mr. Martin thought that Mr. Farris was relaying information about Defendant to the FBI although he had no basis for his suspicions. When he told Defendant, Defendant "was very distraught." After Defendant learned about Mr. Farris' cooperation with the investigating officers about the conspiracy to murder the Levines, Defendant asked Mr. Martin to say that he had never seen Defendant and Mr. Farris communicate with each other while Mr. Farris was housed on the fourth floor.

Kevin Carroll, an investigator for the Davidson County Sheriff's Department and a task force officer with the FBI's Violent Crime and Gang Task Force in Nashville, testified that he participated in the investigation of the conspiracy to kill Carolyn and Lawrence Levine. Investigator Carroll arranged for two digital tape recorders to be placed into Nathaniel Farris' cell on October 6, 2005. Investigator Carroll recovered the digital tapes from Mr. Farris during the evening of October 6, 2005. Mr. Farris was then transferred to the Williamson County jail.

Investigator Carroll explained that inmates housed in the Special Management Unit were on "house alone/rec alone" status which meant that Defendant was not allowed out on recreation at the same time as the other inmates. Investigator Carroll said that the fourth floor was under twenty-four hour surveillance, and a redacted copy of the surveillance videotape for the twenty-four hour period from October 6, 2005 to October 7, 2005, was introduced as an exhibit. The video tape shows Defendant walking up and down the corridor between the two rows of cells and then approaching Mr. Farris' cell. A second surveillance videotape, showing Defendant's interaction with Mr. King, was introduced as an exhibit and played for the jury.

Kenneth Sena, a supervisory special agent with the FBI assigned to the Guadalajara, Mexico office, testified that he conducted a surveillance of Arthur March on October 27, 2005, in connection with the investigation of the conspiracy to kill Carolyn and Lawrence Levine. Agent Sena stated that Mr. March left his home that day at approximately 12:30 p.m. and arrived at the Guadalajara International Airport at approximately 1:05 p.m. At approximately 3:00 p.m., Agent Sena approached Mr. March and asked Mr. March why he was at the airport. Agent Sena said that Mr. March appeared "physically shaken" and "turned pale." Mr. March sat down, and Agent Sena gave Mr. March time to catch his breath. Mr. March said that he was at the airport to meet a friend named "Bobby Givings."

Agent Sena informed Mr. March that "Mr. Givings" had arrived at the airport but was being detained by immigration officers.

Pat Postiglione, a detective with the Metro Nashville Police Department, testified that he and Detective Bill Pridemore escorted Defendant from Los Angeles to Nashville on August 12, 2005, after Defendant's arrest in Mexico on the murder charge. During the trip to the airport and the flight itself, Detective Postiglione said that Defendant indicated that he wanted to talk. Detective Postiglione told Defendant that he understood that Defendant was an attorney, and told Defendant that he had no intention of interrogating him on the trip, and that Defendant was under no obligation to speak to him. Defendant said that he appreciated the information, but then began to talk. Defendant initially denied killing the victim but said that "he wanted to close this chapter in his life," and "his attorneys would be contacting the police very soon."

Defendant asked Detective Postiglione about the State's evidence against him and whether the victim's body had been found. Defendant asked Detective Postiglione to contact the district attorney general in charge of the case over the weekend. Defendant said he would enter a plea of guilty to the victim's death in exchange for a sentence of between five and seven years. Defendant said, "Prior to the Janet incident, I have not been involved in any other criminal-type activity." Detective Postiglione informed Defendant that he was not authorized to enter into any plea negotiations, but Defendant continued to talk about the case during the approximately three-hour flight. Detective Postiglione said that Defendant mentioned a potential sentence of between five and seven years on several occasions. Defendant asked general questions about medium and minimum security prisons and prison life. Defendant said that he would be "100 percent honest" if a settlement agreement could be reached. Detective Postiglione told Defendant that he could not answer for the District Attorney's office, but he would relay the terms Defendant wanted out of a potential settlement agreement. Defendant also asked hypothetically whether a person would face a second degree murder charge if the death was accidental. Defendant told Detective Postiglione that "he intensely loved Janet," but she was not the angel portrayed in the media.

Detective Postiglione subsequently received information that Mr. Farris had certain information concerning Defendant. Mr. Farris disclosed Defendant's plan to kill Carol and Lawrence Levine during a meeting on October 4, 2005. Detective Postiglione verified that Mr. Farris was housed next to Defendant's cell and that Mr. Farris had placed a telephone call to Mexico on Defendant's behalf. Detective Postiglione said that the fourth floor's surveillance videotape showed lengthy conversations between Defendant and Mr. Farris. Mr. Farris agreed to digitally record any conversations with Defendant which were later downloaded to a compact disc. The compact disc was introduced as a exhibit [sic] and played for the jury.

Detective Postiglione stated that Mr. Farris agreed to place five telephone calls to Arthur March on October 12, 14, 20, 25 and 27, 2005. On October 27, 2005, Mr. Farris told Mr. March that he had murdered the Levines and that he was at the Houston International Airport waiting for his flight to Guadalajara, Mexico. Mr. Farris asked Mr. March to pick him up at the airport. The tapes of the recorded telephone conversations between Arthur March and Mr. Farris were introduced as an exhibit and played for the jury.

Detective Postiglione said that Defendant's residence on Blackberry Road was approximately 4.8 miles from the Brixworth Apartments. A demonstration mountain bicycle ride from Defendant's residence to the Brixworth Apartments took approximately thirty minutes.

Sharon Bell testified that Defendant represented her in 1994 during a real estate transaction. Ms. Bell and her husband, Fred Zimmerman, purchased approximately one

hundred acres of undeveloped land on Hillsboro Road north of Old Hickory Boulevard. Ms. Bell said that Defendant reviewed the original plat for the property and physically inspected the property on at least one occasion. The property was purchased and divided into lots. Ms. Bell stated that she talked with Defendant frequently concerning the progress of the property's development. Ms. Bell accepted an offer to purchase Lot No. 2 on September 4, 1996, and the closing was scheduled for October 8, 1996.

The State rested its case-in-chief, and Defendant presented his defense. Robert L. Jackson testified that he had been practicing law since 1965 exclusively in the area of family law including divorces. Mr. Jackson said that Defendant scheduled an appointment with him for August 27, 1996. Mr. Jackson stated that a copy of the list entitled "Janet's 12-day Vacation" was in his file.

Kyle P. Sowell, the chief deputy clerk of the Davidson County Probate Court, testified that Arthur March filed a pleading in the probate court in connection with the probate of the victim's estate on July 30, 1999. The parties entered an agreed upon stipulation that "this pleading alleged in part that Larry Levine killed Janet March, hid his crime completely, and has attempted to deflect the blame from himself and onto his [Arthur's] son, Perry." On cross-examination, Mr. Sowell said that the pleading was neither verified nor notarized, and the issues raised in the pleading were not addressed by the probate court before the case was closed.

David Roh testified that he had been a tire salesperson for approximately twenty-seven years at the same establishment as Robert Armstrong. Mr. Roh said that he sold Defendant four tires for his Jeep Cherokee on August 21, 1996. Mr. Roh stated that it was the store's policy to tell a potential buyer whether or not new tires were actually needed. Mr. Roh said that he did not remember having that conversation with Defendant.

The parties entered an agreed upon stipulation that Defendant leased an apartment in University Square Apartments from Dr. Robert Maddox on August 17, 1996.

Corporal Steve Howard testified that he was a Special Management Unit Officer on the fourth floor of the Criminal Justice Center in 2005. Corporal Howard stated that Cornelius King was housed on the fourth floor from October 21, 2005, until January 6, 2006. On one day during that period, Mr. King asked Corporal Howard if he could move to a different cell because there was a ghost in his cell.

Sergeant Paul Roberts, another supervisor with the Special Management Unit, testified that on one occasion, the faucet in Mr. King's cell was stuck so that the water ran continuously. Sergeant Roberts said that the sink could be accessed from outside the cell. Sergeant Roberts fixed the faucet and then turned the water on and off repeatedly to make sure that it would not stick again. Sergeant Roberts stated that Mr. King became very excited, and Sergeant Roberts explained that he was working on the plumbing to the cell. On cross-examination, Sergeant Roberts stated that Mr. King calmed down when he found out that Sergeant Roberts was the one turning the water on and off.

Corporal Alicia McArthur testified that she worked in the Special Management Unit on the fourth floor of the Criminal Justice Center. Corporal McArthur stated that in March 2006 Defendant filed a complaint against Mr. King after which Mr. King was moved to a different location. On cross-examination, Corporal McArthur said that, according to Defendant's complaint, Mr. King had threatened to have other inmates harm Defendant if Defendant did not give Mr. King his apple pie. Corporal McArthur acknowledged that the threat could not have actually been carried out because Defendant was on "house alone/rec alone" status. Corporal McArthur stated that the substance of the threat was not investigated because no disciplinary report was filed. Corporal McArthur acknowledged that Mr. King was not moved on the day of the reported threat.

Sergeant Sheila Stinson with the Davidson County Sheriff's Department testified that she investigated Mr. King's alleged threat against Defendant. Sergeant Stinson determined that Mr. King needed to be moved because Defendant said that Mr. King had threatened to bodily harm him. On cross-examination, Sergeant Stinson stated that her investigation was limited to talking with Mr. King and Defendant. Sergeant Stinson acknowledged that no inmate would have been able to harm Defendant because of his "house alone/rec alone" status.

A video taped interview of Samson March by a news reporter in May 2000 was entered as an exhibit at trial and played for the jury. In his statement, Samson said that on August 15, 1996, his mother came into his bedroom, gave him a good-night kiss, and told him that she would be back soon. Samson stated that she had two suitcases with her and was wearing a white shirt and brown velvet slacks. Samson said that he went to his bedroom window and waved at the victim as she drove away, and the victim waved back.

The State called the following rebuttal witnesses. Carolyn Levine testified that only the rooftop of a vehicle leaving the house was visible from Samson's second story bedroom. Ms. Levine stated that Samson had never before said that the victim had told him goodbye on August 15, 1996, or that the victim left the house with a suitcase.

Kim Abbington-Scott testified that she was Samson Levine's kindergarten teacher in 1996. Ms. Abbington-Scott said that Samson was very sad on the first day of school on August 26, 1996. Samson told Ms. Abbington-Scott that his mother had left, and he did not get to tell her good-bye before she left.

Ralla Klepak testified that she was appointed to represent the March children in court proceedings in Chicago. Ms. Klepak stated that Samson told her that he did not know where his mother was, and that the last thing he heard on the night she left was his mother and father arguing downstairs after he had gone to bed. When he went downstairs the next morning, his mother was gone. Ms. Klepak described Samson as "very traumatized and sad."

*March v. State*, 395 S.W.3d 738, 745–61 (Tenn. Ct. Crim. App. 2011), *perm. appeal denied* (Tenn. July 14, 2011).

## II.    DISCUSSION

The issues raised in March's petition, as amended,[2] are as follows:

1.      That the admission of the petitioner's statements made in conversations with police on August 12, 2005, during his transport from Los Angeles to Nashville, violated the petitioner's Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny.

2.      That admission of the petitioner's statements made in conversations with police on August 12, 2005, during his transport from Los Angeles to Nashville, violated the petitioner's Sixth Amendment right to counsel.

---

[2] As stated above, the petitioner has filed a motion to amend his petition to dismiss Grounds 4, 5, and 6 set forth in the original petition, which address evidentiary rulings and sentence enhancement under state law. The Court therefore will not address those grounds for relief. The petitioner continues to pursue Grounds 1, 2, 3, and 7.

3.    That admission of evidence of jailhouse interactions between the petitioner and Russell Nathaniel Farris, a/k/a Bobby Givings, who was cooperating with authorities, violated the petitioner's Sixth Amendment right to counsel.

7.    That the cumulative effect of the errors identified in the habeas petition rendered the petitioner's trial fundamentally unfair, such that his convictions violate constitutional due process guaranties.

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). The Warden concedes in this case that the four issues presented for review, as referenced above, were properly exhausted in the state courts and may appropriately be considered by this Court.

Even where the grounds for relief asserted in a petitioner's application for a writ of habeas corpus under § 2254 raise federal constitutional claims that have been exhausted in the state courts and are properly raised in this Court, the scope of this Court's review of the state court's resolution of the issues is quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*

A state court's decision is "contrary to . . . clearly established federal law" if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Lundgren v. Mitchell*, 440 F.3d 754, 762–63 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413

(2000)) (internal quotations and alterations omitted). A state court decision is "an unreasonable application of clearly established federal law" if "the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 763. Clearly established federal law is determined by the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Id.*

The Supreme Court has stressed that AEDPA's standard is "difficult to meet" and "demands that [state court] decisions be given the benefit of the doubt." *Cullen v. Pinholster*, --- U.S. ----, 131 S. Ct. 1388, 1398 (2011) (internal quotations and citations omitted). In reviewing whether a state court decision was an unreasonable application of federal law, a district court must remain mindful that the inquiry is objective, and that "an *unreasonable* application of federal law is different from an *incorrect* [one]." *Williams*, 529 U.S. at 410. The Court must therefore decline to award habeas relief where fair-minded jurists could disagree on the correctness of the state court's decision. *Harrington v. Richter*, --- U.S. ----, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In addition, "AEDPA . . . requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007) (quoting 28 U.S.C. § 2254(e)(1)).

Where there is no state-court decision articulating its reasons for rejecting the petitioner's claim, a federal court's review nevertheless remains deferential; it should focus on the result of the state court's decision to determine whether it is "in keeping with the strictures of the AEDPA," *i.e.*, whether it is contrary to or involves an unreasonable application of federal law. *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000).

With these principles in mind, the Court will proceed to consider March's claims.

### Ground 1: That the admission of the petitioner's statements made in conversations with police officers on August 12, 2005, violated the petitioner's *Miranda* rights.

As set forth above, March was arrested in Mexico on August 3, 2005 and immediately transported to a jail in Los Angeles, California. He waived extradition and was transported to Nashville by two Metro police officers, Sergeant Pat Postiglione and Detective Bill Pridemore, on August 12, 2005. While *en route* from Los Angeles to Nashville, March and his police escorts engaged in lengthy conversations, the contents of which March sought to suppress before trial on the basis of various legal theories, including

that admission of the conversations violated March's constitutional privilege against self-incrimination. The trial court denied March's suppression motion in a written order. (R. Vol. III, at 384–98, ECF No. 34-3, at 92–106.)

In the trial court and on appeal, March argued that introduction of the evidence of the statements he made during the trip from Los Angeles to Nashville on August 12, 2005 violated his Fifth Amendment privilege against self-incrimination, as the Supreme Court applied that privilege in *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Court held that an individual who is in police custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda*, 384 U.S. at 479–80.

In rejecting March's claim, the Tennessee Court of Criminal Appeals summarized the testimony given by Sergeant Postiglione as indicating that March first initiated a conversation during the drive from the Los Angeles County Jail to the airport, and made reference to an attorney he called Brent. At that time, according to Postiglione's testimony at the hearing on March's motion to suppress, the officer told March that he understood March was an attorney and that, as an attorney, he understood he had no obligation to speak to the police "about his situation, if he didn't wish to." (Transcript of Hearing on Motion to Suppress, ECF No. 34-6, at 102:10–13.) Postiglione stated: "I further told him that we would not pressure him in any way or try to interview him or get any sort of a statement; but I invited any questions or comments he may have, to feel free to share that with us, if he wanted to." (*Id.* at 102:14–18.) On cross-examination, Postiglione conceded that he did not provide an express *Miranda* warning, but added that March was never interrogated during the trip to Nashville. (*Id.* at 121:8–13.) Postiglione also testified that he was aware that March was represented by counsel. According to Postiglione, March engaged Postiglione in conversation throughout the trip, asking him questions and making several self-incriminatory statements over the course of the day. Postiglione testified that he never asked March any

questions, but that he responded to March's questions if he felt he could and did not discourage him from talking.

In ruling on the question of whether March had been subjected to the "functional equivalent" of a custodial interrogation, the trial court specifically addressed March's arguments regarding certain comments Postiglione made during their conversation, which March claimed essentially invited an incriminating response. These comments included one instance in which Postiglione responded to March's statement that he wanted to "close this chapter in his life" and "he felt his attorneys would be contacting the police again soon." (Postiglione's 8/12/2005 Written Report at 1, ECF No. 34-8, at 3.) According to Postiglione's written report, the police officer said to March, "[S]ometimes things happen that some people may perceive one way when, in fact, it is something totally different. I used as an example – a moment of anger instantly regretted. I gave the scenario of someone killing someone else by accident compared to walking up behind someone and shooting them in the back of the head – and said that there is a stark difference between the two." (*Id.*) According to Postiglione, however, March did not respond to this statement, and no further conversation other than small talk ensued until at least an hour later, and it was unrelated to that comment. The trial court found that, if indeed Postiglione's statement was intended to induce an incriminating response, it failed in its objective, because it did not elicit any response at all. (ECF No. 34-3, at 102.)

Similarly, at a later point, March told Postiglione that he "intensely" loved Janet, but then "did not argue when [Postiglione] said that sometimes people hurt people they love in a moment of anger." (ECF No. 34-8, at 5.) March responded by changing the subject, stating, "You don't have a witness saying they saw me killing Janet," and asking why the police had waited nine years to indict him. (*Id.*) The trial court found with respect to this statement too that, "[i]f Postiglione's remarks about 'heat of passion' . . . were a police tactic . . . , the tactic appears to have failed." (ECF No. 34-3, at 103.)

In affirming the trial court's decision, the Tennessee Court of Criminal Appeals found that, although there was "no question that [March] was in custody," *March*, 395 S.W.3d at 765, nothing in Postiglione's written notes or testimony at the suppression hearing or at trial indicated that March was subjected to a custodial interrogation or its functional equivalent under *Miranda*, and therefore that the police officer's conduct during the trip to Nashville did not violate March's privilege against self-

incrimination. *Id.* at 765–67. More specifically, the court articulated the applicable legal standards and ruled as follows:

> The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, a suspect has the right to have counsel present during a custodial interrogation. *Miranda*, 384 U.S. at 460–72. Once a suspect invokes his right to counsel under the Fifth Amendment, he or she "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). The *Miranda* court held that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444 (footnote omitted). "Custodial interrogation" for Fifth Amendment purposes includes not only express questioning, but also its "functional equivalent" which is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

> However, the *Miranda* court also explained that:

> [i]n dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element of law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478.

Defendant argues that his statement to Detective Postiglione that he "felt that his attorneys would be contacting the police again" was an unequivocal invocation of his right to counsel, and that Detective Postiglione's hypothetical example concerning the difference between an accidental killing and a premeditated killing was the functional equivalent of interrogation in violation of his Fifth Amendment rights.

There is no question that Defendant was in custody. However, Detective Postiglione testified that he did not intend to interrogate Defendant during the flight from Los Angeles to Nashville. Defendant was so informed and advised of his right to remain silent. (We note that according to the deposition introduced as an exhibit at the suppression hearing, Defendant invoked his Fifth Amendment privilege against self-incrimination over seventy times thus illustrating his familiarity with his right to remain silent.) Defendant's comment that his attorneys would be contacting the police soon, on its face, is not an unequivocal request to deal with the police only through counsel. Defendant, an attorney himself, was clearly aware that he had the right to counsel. He had already spoken to counsel in California and had retained counsel in Tennessee before he was returned to this State. Defendant provided the names and telephone numbers of his attorneys to Detective Postiglione during the flight. At no time, however, did Defendant during the trip express

any desire not to talk to Detective Postiglione until his counsel was present, and the record does not support Defendant's contention that he felt coerced to talk.

On the contrary, Defendant continued to initiate conversations with Detective Postiglione over a two-hour period, falling quiet only to eat or nap. Defendant appeared very focused on his own agenda which was to find out as much as possible about the State's evidence against him and whether a plea agreement with a short sentence was possible. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983) (concluding that the defendant's question, "Well, what is going to happen to me now?" evinced "a willingness and desire for a generalized discussion about the case" and "was not merely a necessary inquiry arising out of the incidents of the custodial relationship"); *State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App., 2000) (observing that "[i]t is well established that questioning initiated by the defendant is not interrogation in the *Innis* sense") (citing *Edwards*, 451 U.S. at 484)).

Although a police officer should refrain from making a comment designed to elicit a response from a defendant, including comments which minimize the crime with which the defendant is charged, the *Edwards* Court explained:

[i]f, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will do or say something that clearly would be interrogation. In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with authorities.

*Edwards*, 451 U.S. at 486.

Although an officer's intent may be relevant in determining "whether the officer should have known his or her words or actions were reasonably likely to invoke an incriminating response," the primary focus rests "upon the accused's perception rather than on the police officer's intent." *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005) (citing *Innis*, 446 U.S. at 301). In the case *sub judice*, Defendant observed that "we are just two men having a conversation." Defendant said that although he did not trust Detective Postiglione because he was a police officer, he found that Detective Postiglione "might be an honorable man." At the conclusion of the flight, Defendant stated that he was glad that it was Detective Postiglione who had been assigned to escort him back to Tennessee, that he had no complaints, and that Detective Postiglione had treated him well. The record does not support Defendant's contention that he felt that he was being subject to interrogation during the flight.

Based on our review of the totality of the circumstances surrounding the giving of Defendant's statements, we conclude that the evidence does not preponderate against the trial court's finding that the admission of Defendant's August 12, 2005, statements did not violate Fifth Amendment principles. Defendant is not entitled to relief on this basis.

*March*, 395 S.W.3d at 765–67.

In his petition for habeas relief, March takes issue with the state appellate court's implicit finding that he waived his right to counsel by "initiating" conversations with the police, and disputes that position by pointing out that he could not waive rights whose existence had not been fully disclosed to him. In fact, most of March's argument is devoted to a discussion of the requirement of a full *Miranda* warning, without

which any evidence obtained as the result of a custodial interrogation must be excluded. (ECF No. 2, at 15 (citing *Jackson v. Giurbino*, 364 F.3d 1002, 1008–09 (9th Cir. 2004)).) March also contests the state court's holding that Postiglione's conversation with March did not amount to a "functional equivalent of an interrogation." (ECF No. 2, at 13.)

There is obviously no question that *Miranda*, issued in 1966, is clearly established law, the basic holding of which has been repeatedly reaffirmed by the Supreme Court. *See Dickerson v. United States*, 530 U.S. 428, 434–35 (2000). The Court also finds that a criminal defendant is not in a position to waive his *Miranda* rights until and unless he has been fully informed of them, and that Postiglione conceded in this case that he did not provide a *Miranda* warning to March. The Tennessee Court of Criminal Appeals determined based on a "totality of the circumstances" that Postiglione had reminded March of his right to remain silent, that March was an attorney and was obviously aware of his right not to talk to police officers, and that March had demonstrated his understanding of his right to remain silent by evoking his Fifth-Amendment rights numerous times during his deposition in a civil case instituted against him by the Levines. The court did not address, however, the question of whether March had been made aware of the consequences of speaking to police officers if he chose to do so, or of the fact that anything he said to the police could be used against him at trial. Neither the facts nor the law supports a conclusion that March was given an effective *Miranda* warning by Postiglione. Regardless, the state court's decision did not rest upon any such conclusion.

Rather, the court focused primarily on the question of whether March was subjected to an interrogation or its "functional equivalent" while being transported from Los Angeles to Nashville. As referenced above, the state court found that no interrogation or its functional equivalent had occurred. Obviously, if there was no interrogation or its equivalent, there was never a need for *Miranda* warnings. This Court is not at liberty to conduct its own independent analysis of the issue of whether an interrogation occurred. Rather, under the AEDPA's "highly deferential" standard of review, which "demands that state-court decisions be given the benefit of the doubt," *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotations omitted), the Court must determine whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 406 (2000), the United States Supreme Court explained that an "unreasonable application" occurs when "the state court identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." The *Williams* Court further explained that a federal habeas court may not find a state-court adjudication to be "unreasonable," within the meaning of § 2254(d)(1), "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. In other words, such a finding is a necessary, but not sufficient, predicate to the granting of habeas relief. This Court also must find that the decision of the Tennessee court was "objectively unreasonable," in the sense that it involved an objectively unreasonable application of clearly established Supreme Court precedent. *Id.* at 409.

With regard to the petitioner's claim here, it is clear, first, that the state trial and appellate courts applied the appropriate legal standard. In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court declined to interpret or apply the holding in *Miranda* narrowly:

> The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. The police practices that evoked this concern included several that did not involve express questioning. . . . The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society." It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.

*Id.* at 299 (emphasis added) (internal citations omitted). In light of these concerns, the Court defined the term "interrogation" in the *Miranda* context as follows:

> "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.
>
> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300–02 (emphasis in original; footnotes omitted).

In *Innis*, the defendant had been placed under arrested, advised of his *Miranda* rights, and was being transported by police officers to a police station in a patrol car. "The respondent stated that he understood [his *Miranda*] rights and wanted to speak with a lawyer." *Id.* at 294. While in the car, however, the officers began to speak to each other about the murder weapon, which they had not yet located. One of the officers testified as follows:

> I was talking back and forth with [a second police officer] stating that I frequent this area while on patrol and [that because a school for handicapped children is located nearby,] there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.

*Id.* at 294–95 (second alteration in original). The second officer "apparently shared his fellow officer's concern," indicating that he "more or less concurred with [the first officer] that it was a safety factor and that we should, you know, continue to search for the weapon and try to find it." *Id.* at 295. Sometime during the course of this discussion, Innis "interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located. . . . The respondent then led the police to a nearby field, where he pointed out the shotgun under some rocks by the side of the road." *Id.*

After considering the above facts, the Supreme Court held that the officers' conversation was not reasonably likely to elicit an incriminating response. *Id.* at 302. The court noted that nothing in the record indicated that the suspect was "peculiarly susceptible to an appeal to his conscience," and further elaborated that

> [t]he case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that [the suspect] would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Id.* at 302–03.

In the present case, the petitioner argues passionately that he "initiated *nothing*." (ECF No. 2, at 16.) He also asserts that he was in a particularly vulnerable state, psychologically, because he had been "[y]anked from his family and children in Mexico, thrown into a Los Angeles county jail for six days, unshowered the entire time, and in emotional turmoil over his children's safety." (*Id.*) Moreover, during the

trip to Nashville, he was forced to sit "in an uninterrupted continuum of police custody, handcuffed and flanked by two cagey homicide detectives for hours and hours as part of a deliberate plan that the police knew, or should have known, was the functional equivalent of interrogation." (*Id.*) March did not testify at the hearing on the motion to suppress or at trial, however, and the record simply does not support his contention that he initiated "nothing." Postiglione testified that he did not question March and instead that March initiated all substantive conversations while the police officer simply responded to questions. The trial court expressly found Postiglione's testimony to be credible, and this Court is bound by that conclusion. *See* 28 U.S.C. § 2254(e)(1) (factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004).

This Court is unaware of any Supreme Court or other case precedent suggesting that the amount of time a defendants spends in a police officer's presence, being transported or otherwise, alone may be sufficient to create an inference of interrogation or a *per se* coercive environment. In short, the Court cannot find that the Tennessee trial and appellate courts' resolution of this issue was unreasonable. By the time March was being transported to Nashville after his arrest in Mexico, he had been denying his involvement in his wife's disappearance for nearly a decade and, as both a lawyer and a litigant, had substantial familiarity with the justice system. Postiglione told March early in their interaction that he understood that March was an attorney and that March knew he did not have to speak to the police officers. Postiglione told him they did not intend to interrogate him. March clearly was aware that he did not have to speak, and he was not placed in an intimidating or innately coercive environment—to the contrary, in fact. In that regard, the record reasonably supports the state court's finding that March was not subject to "a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300. Nor is this a case "where the police carried on a lengthy harangue in the presence of the suspect." *Id.* at 303; *cf. Fleming v. Metrish*, 556 F.3d 520, 527 (6th Cir. 2009) (recognizing that "extended comments directed toward a suspect are more likely to elicit an incriminating response").

As the Sixth Circuit noted in *Fleming,* in the context of a habeas claim based on an alleged misapplication of *Innis*:

> There are strong arguments both for and against construing [the police officer's] comments as an interrogation. Indeed, were [this] appeal a direct one to be reviewed *de*

*novo*, the possibility exists that we might have agreed with [the petitioner's] position. But the fact that a federal court might disagree with the [state] Court of Appeals'[] application of *Innis* does not justify the conclusion that the [state] court unreasonably applied the Supreme Court's decision.

*Fleming*, 556 F.3d at 527–28 (citations omitted); *cf. Shaneberger v. Jones*, 615 F.3d 448, 454 (6th Cir. 2010) (finding that the question of whether the police detective should have known his comments would elicit an incriminating response presented a "close question," but one that "could reasonably be answered by a state court in the negative"). Likewise in this case, the state court clearly identified the correct legal principles, and did not unreasonably apply those principles to the facts of March's case. The Court concludes that the petitioner is not entitled to relief on the basis of this claim.

> **Ground 2. That admission of the petitioner's statements made during his transport from Los Angeles to Nashville violated the petitioner's Sixth Amendment right to counsel under *Massiah v. United States*, 377 U.S. 201 (1964)**

The Sixth Amendment guarantees a criminal defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "This right has been accorded, . . . 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.'" *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)). Thus, "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citations omitted). "Interrogation by the State is such a stage." *Id.* (citing *Massiah v. United States*, 377 U.S. 201, 204–05 (1964); *United States v. Henry*, 447 U.S. 264, 274 (1980)). Moreover, the term "interrogation" is not necessarily defined the same for purposes of Fifth and Sixth Amendment analysis. *See Rhode Island v. Innis*, 446 U.S. 291, 300 n.4 (1980) ("The definitions of 'interrogation' under the Fifth and Sixth Amendments, if indeed the term 'interrogation' is even apt in the Sixth Amendment context, are not necessarily interchangeable, since the policies underlying the two constitutional protections are quite distinct."). For Sixth Amendment purposes, "interrogation" occurs when law enforcement officers "deliberately elicit" information from an individual in the absence of counsel after the right to counsel has attached. *Massiah*, 377 U.S. at 206; *Innis*, 446 U.S. at 300 n.4. Thus, the fact that it was reasonable for the state court to conclude that March was not subject to an interrogation for purposes of Fifth-Amendment analysis is not necessarily dispositive of the question of whether March's Sixth-Amendment right to counsel was violated.

A defendant is "denied the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206. The right to counsel applies not only to direct confrontations by known government officers, but also to "'indirect and surreptitious interrogations'" by covert government agents and informants. *Henry*, 447 U.S. at 273 (quoting *Massiah*, 377 U.S. at 206); *see also Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) ("[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the direct equivalent of police interrogation."). As the Supreme Court stated in *Maine v. Moulton*, 474 U.S. 159 (1985),

> [o]nce the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Id.* at 170–71 (footnote omitted). Therefore, a Sixth Amendment violation occurs whenever the State "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel," *Henry*, 447 U.S. at 274, or "knowing[ly] exploit[s]" a situation in order to obtain incriminating information from a defendant "without counsel being present." *Moulton*, 474 U.S. at 176.

As set forth above, the Supreme Court has recently reconfirmed that, once the adversarial judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings, and that interrogation by the State is such a stage. *Montejo*, 556 U.S. at 786. The defendant may only waive his right to counsel if the waiver is voluntary, knowing and intelligent. Such a waiver is ordinarily accomplished when a defendant is read his *Miranda* rights and agrees to waive those rights, even though *Miranda* rights derive from the Fifth Amendment. *Id.*

In *Fellers v. United States*, 540 U.S. 519 (2004), the Supreme Court held that two police officers violated the Sixth Amendment by deliberately eliciting information from the defendant during a post-indictment visit to his home in the absence of counsel or waiver of counsel, regardless of whether the

officers' conduct constituted "interrogation" *per se*.[3] In reaching that conclusion, the Court specifically held as follows:

> The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)). We have held that an accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States*, 377 U.S. 201, 206 (1964); *cf. Patterson* [*v. Illinois*, 487 U.S. 285 (1988)] (holding that the Sixth Amendment does not bar postindictment questioning in the absence of counsel if a defendant waives the right to counsel).
>
> We have consistently applied the deliberate-elicitation standard in subsequent Sixth Amendment cases, *see United States v. Henry*, 447 U.S. 264, 270 (1980) ("The question here is whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements . . . within the meaning of *Massiah*"); *Brewer*, [430 U.S.] at 399 (finding a Sixth Amendment violation where a detective "deliberately and designedly set out to elicit information from [the suspect]"), and we have expressly distinguished this standard from the Fifth Amendment custodial-interrogation standard, *see Michigan v. Jackson*, 475 U.S. 625, 632, n.5 (1986) ("[T]he Sixth Amendment provides a right to counsel . . . even when there is no interrogation and no Fifth Amendment applicability"); *Rhode Island v. Innis*, 446 U.S. 291, 300, n.4 (1980) ("The definitions of 'interrogation' under the Fifth and Sixth Amendments, if indeed the term 'interrogation' is even apt in the Sixth Amendment context, are not necessarily interchangeable[.]"); *cf. United States v. Wade*, 388 U.S. 218 (1967) (holding that the Sixth Amendment provides the right to counsel at a postindictment lineup even though the Fifth Amendment is not implicated).

*Fellers*, 540 U.S. at 523–24.

Based, essentially, on the same arguments underlying his *Miranda*-violation claim, March contends that Sergeant Postiglione violated his Sixth Amendment right to counsel when he deliberately elicited inculpatory statements from him during the trip from Los Angeles to Nashville, in the absence of a valid waiver of his right to counsel. The respondent concedes that this claim was fully exhausted in the state courts.

In considering and rejecting March's claim of a Sixth-Amendment violation, the state appellate court correctly referenced the controlling law as set forth in the Sixth Amendment and *Massiah v. United States*, 377 U.S. 201 (1964): that a criminal defendant is entitled to an attorney at every critical stage of

---

[3] In *Fellers*, two police officers went to the petitioner's home to arrest him. Upon arriving there, the officers identified themselves, asked to come inside and, once invited inside, told the petitioner they had come to discuss the petitioner's involvement in methamphetamine distribution. *Id.* at 521. They informed him they had a warrant for his arrest and that a jury had indicted him for conspiracy to distribute methamphetamine. They also told the petitioner that the indictment "referred to his involvement with certain individuals, four of whom they named." *Id.* The petitioner then volunteered that he knew the individuals and had used methamphetamine. *Id.*

the criminal proceedings, and that police interrogation is a critical stage. The court also noted that a defendant can waive his Sixth Amendment right to counsel, citing *Montejo*, 556 U.S. at 786–87. The state court concluded that March has knowingly and intelligently waived his right to counsel, reasoning as follows:

> For Sixth Amendment purposes, "[t]he U[nited] S[tates] Supreme Court has clearly sanctioned the admissibility of a statement given after the appointment of counsel and even after defendant has 'expressed his desire to deal with police only through counsel,' where defendant initiates further communication, electing 'to face the state's officers and go it alone,' and knowingly and intelligently waives his Sixth Amendment right to counsel.["] *State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989) (quoting *Patterson v. Illinois*, 487 U.S. 285 (1988); *Edwards v. Arizona*, 451 U.S. 477 (1981)); *see also Oregon v. Bradshaw*, 462 U.S. [1039,] 1045 [(1983)].

> Because "a Sixth Amendment violation does not depend upon coercion, the protection of the Sixth Amendment is not waived by conduct that shows only that a defendant's statements were not coerced." *Wyrick v. Fields*, 459 U.S. 42, 54 (1982). Therefore, "[t]he State must show that the defendant intelligently and knowingly relinquished his right not to be questioned in the absence of counsel. The State can establish a waiver only by proving 'an intentional relinquishment or abandonment' of the right to have counsel present." *Wyrick*, 459 U.S. at 54 (citing *Brewer*, 430 U.S. at 404, quoting *Johnson* [*v. Zerbst*], 304 U.S. [458,] 464 [(1938)].

> Defendant argues that the record is devoid of any indication that he intentionally relinquished his Sixth Amendment right to counsel. Relying on *Massiah* and *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980), Defendant contends that Sergeant Postiglione impermissibly and deliberately elicited incriminating statements from him during the flight.

> Both the *Massiah* court and the *Berry* court were presented with similar situations. Each defendant in the two cases had been indicted and had retained counsel. An undisclosed agent of the State (a co-defendant in *Massiah* and a disguised Tennessee Bureau of Investigation agent in *Berry*) approached the respective defendant at the direction of law enforcement officials and engaged him in conversation during which each defendant made incriminating statements concerning his current charges. *Massiah*, 377 U.S. at 202–03; *Berry*, 592 S.W.2d at 555–56. The *Massiah* Court concluded that the defendant "was denied the basic protections of that guarantee [the Sixth Amendment right to counsel] when there was used against him at his trial evidence of his own incriminating statements, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206; *Berry*, 592 S.W.2d at 561 (concluding that the eliciting of defendant's incriminating statements under the circumstances presented violated the defendant's Sixth Amendment right to counsel). As the *Berry* court observed, "[t]he law will not permit law enforcement officials to do by ruse, trickery, deceit and deception that which it is not permitted to do openly and honestly." *Id.*

> In *Massiah* and *Berry*, the statements made by each defendant were voluntary. However, the disguise of the true identity of the federal agent in *Massiah* and the role of the co-defendant in *Berry* rendered any purported waiver of the right to counsel unknowing. *See United States v. Henry*, 447 U.S. 264, 273 (1988) (concluding that "the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of [post-indictment] communications with an undisclosed undercover informant acting for the Government").

In the case *sub judice*, however, Defendant clearly understood that Sergeant Postiglione was a police officer assigned to his case. Defendant had previously demonstrated that he understood his right to remain silent during his deposition in a civil case, and Sergeant Postiglione warned Defendant that he had the right to remain silent as soon as Defendant initiated the first conversation on the way to the car rental company. Defendant also knew that he had the right to have his counsel present during any interrogation, but he chose to "go it alone" and enter into a generalized discussion of his case with Sergeant Postiglione. *Bradshaw*, 462 U.S. at 1045. Based on our review, we conclude that Defendant voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel. Defendant is not entitled to relief on this basis.

*March*, 395 S.W.3d at 768–69.

In other words, the Tennessee appellate court's analysis focused on a finding that March knowingly, intelligently and voluntarily waived his right to counsel. The evidence, however, does not support that conclusion, in light of the undisputed fact that Postiglione never provided March a full recitation of his *Miranda* rights. In *every* Supreme Court case to which the Tennessee Court of Criminal Appeals cited in which the Court found that a valid waiver of the right to counsel had occurred, the defendant or petitioner had actually been given *Miranda* warnings, at least once, on the same day or contemporaneously with the waiver. The police officers' failure to give March a full *Miranda* warning in this case makes the Tennessee court's conclusion that a knowing and intelligent waiver had occurred unreasonable.

In fact, Supreme Court precedent has clearly established a rule that, "[a]s a general matter . . . , an accused who is admonished with the warnings prescribed by . . . *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, *and of the consequences of abandoning those rights*, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, 487 U.S. at 296 (emphasis added); *see also Montejo*, 556 U.S. at 786 ("[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick" to effect waiver of Sixth Amendment right to counsel during post-indictment questioning.). In *Patterson*, in fact, the Court considered whether a *Miranda* warning was sufficient for an effective waiver of Sixth Amendment rights. The Court answered that question in the affirmative, but noted in particular that the *Miranda* warning served, not only to apprise a defendant of his right to have counsel present during questioning, but also that a *Miranda* warning makes a defendant "aware of the consequences of a decision by him to waive his Sixth Amendment rights," in particular that "any statement that he made could be used against him in subsequent criminal proceedings." *Patterson*,

487 U.S. at 293. In the wake of *Patterson*, to this Court's knowledge, the Supreme Court has never suggested that any warning *less* complete than a full *Miranda* warning would be sufficient to permit a knowing, intelligent waiver of Sixth Amendment rights. As March argues, a criminal defendant is not in a position to waive rights of which he has not been apprised. The Tennessee appellate court bypassed the obligation of a full *Miranda* warning by noting that March was a lawyer who "obviously" knew he had a right to counsel, but there is no evidence in the record that Postiglione—or anyone else—relayed to March at any time after his arrest in Mexico, his detention in Los Angeles, or his transport to Nashville the full panoply of rights protected by the Sixth Amendment or the effect of waiving those rights.[4] Anyone who watches crime shows on television is likely to be just as aware as March of his right to counsel, but this Court is unaware of any exception to the requirement that a defendant be given a *Miranda* warning before waiving his right to counsel that applies only to lawyers or those who have watched more than their fair share of *Law and Order.*

Moreover, Postiglione's failure to provide a clear warning, especially when it became evident that March was inclined to talk and in light of Postiglione's admission that he wanted and encouraged March to talk, is not excused by his claim that he did not intend to interrogate March and that he did not initiate the exchanges with March. Regardless of the fact that March knew that Postiglione was a police officer, this was clearly a situation where the State, through Postiglione, "intentionally creat[ed] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel," *Henry*, 447 U.S. at 274, and "knowing[ly] exploit[ed]" a situation in order to obtain incriminating information from a defendant "without counsel being present." *Moulton*, 474 U.S. at 176.

In this regard, the Court finds that the factual circumstances in this case are not reasonably comparable to those upon which the Tennessee Court of Criminal Appeals relied most heavily: *Massiah v. United States*, 377 U.S. 201 (1964), *State v. Berry*, 592 S.W.2d 553 (Tenn. 1980), and *Oregon v. Bradshaw*, 462 U.S. 1039 (1983). In both *Massiah* and *Berry*, the criminal defendants were victims of

---

[4] Instead, according to Postiglione's testimony, he "advised [March] that [he] understand that [March] was an attorney and that, certainly, he understood that . . . he was under no obligation to speak with us about his situation, if he didn't wish to." (ECF No. 34-6, at 102.) Postiglione further told March, however, that, although they "would not pressure him in any way or try to interview him or get any sort of statement," they "invited any questions or comments [March] [might] have, [and encouraged him] to feel free to share that with [the officers], if he wanted to." (*Id.*)

police ruse and were not aware that their interlocutors were agents of the police. In *Bradshaw*, the Supreme Court held that the defendant who asked a police officer, "Well, what is going to happen to me now?" effectively waived his right to counsel and opened the door to a generalized discussion of his case. There, however, the defendant had been given a full *Miranda* warning at least twice on the day of his arrest, and, when he began discussing the case with a police officer during his transport from a police station to the county jail the same day, the defendant was again reminded that he had invoked his right to counsel and was told that any discussion with the police had to be "at [his] own free will." *Bradshaw*, 462 U.S. at 1042. March, in contrast, was never given a complete *Miranda* warning. He was simply reminded, early in the day, that, because he was a lawyer, he understood he was under no obligation to talk to the police. The record indicates that his self-incriminating statements were made hours after this half-hearted warning. Thus, the facts here are much more closely akin to those in *Fellers*, insofar as March, like the petitioner in *Fellers*, was entitled to counsel and, although not subjected to interrogation *per se*, was subjected to a police encounter during which police officers intentionally elicited information without providing a *Miranda* warning and without actually asking a single question. *Fellers*, 540 U.S. at 521.

As noted above, a state court's decision is "an unreasonable application of clearly established federal law" if "the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 763. This Court finds that the decision of the Tennessee Court of Criminal Appeals that March knowingly and intelligently waived his Sixth Amendment right to counsel was an unreasonable application of clearly established federal law, which unequivocally requires that a defendant be given a complete *Miranda* warning before he can knowingly and intelligently waive his Sixth Amendment right to counsel. The state appellate court identified the correct legal principles but unreasonably applied those principles to March's case, the facts of which were only barely distinguishable from those in *Fellers*. In reaching this conclusion, this Court is mindful that "an unreasonable application of federal law is different from an incorrect [one]." *Williams v. Taylor*, 529 U.S. 362, 410 (2000), and that the Court must decline to award habeas relief where fair-minded jurists could disagree on the correctness of the state court's decision. *Harrington v. Richter*, --- U.S. ----, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Court's inquiry does not stop at this point, however, because the Supreme Court has stated that harmless-error analysis applies in those instances where statements are obtained and introduced into evidence under circumstances that violate the Sixth Amendment right to counsel. *See Milton v. Wainwright*, 407 U.S. 371, 372 (1972) (holding that harmless-error analysis applied to the admission of post-indictment, pretrial confessions obtained by a police officer posing as a fellow prisoner, in violation of a suspect's Sixth Amendment right to counsel). For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see id.* at 634 (recognizing a distinction between direct and collateral review, and that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment" (citations omitted)); *see also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (confirming that *Brecht* applies in a § 2254 proceeding, "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*], 386 U.S. 18 [(1967)]").

"Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (citation omitted). The *Brecht* harmless-error analysis "protects the State's sovereign interest in punishing offenders and its 'good-faith attempts to honor constitutional rights.'" *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (quoting *Brecht*, 507 U.S. at 635). Application of this standard requires a district court judge to ask, "Do I, the judge, think that the error substantially influenced the jury's decision?" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). If a federal habeas judge is in "grave doubt" about whether a constitutional trial error "had substantial and injurious effect or influence in determining the jury's verdict," or if the court is in "virtual equipoise as to the harmlessness of the error" under the *Brecht* standard, the court should "treat the error . . . as if it affected the verdict." *Id.* at 435.

The question before this Court, then, is whether the evidence regarding March's statements to Postiglione during the trip from Los Angeles to Nashville had a substantial injurious effect on the jury's verdict. In applying the "substantial and injurious effect" standard in *Brecht*, the Supreme Court concluded

that the error in question (references to the petitioner's post-*Miranda* silence) did not substantially influence the jury's verdict, based on the Court's finding that (1) the State's improper references "were infrequent, comprising less than two pages of the 900-page trial transcript"; (2) the State's "extensive and permissible references to the petitioner's pre-*Miranda* silence" made the improper references, "in effect, cumulative"; and (3) "the State's evidence of guilt was, if not overwhelming, certainly weighty." *Brecht*, 507 U.S. at 639. The resolution of the issue in *Brecht* is instructive here. When the evidence of record is viewed as a whole, the Court is firmly persuaded that the improperly admitted evidence of March's statements made to Postiglione during the trip from Los Angeles to Nashville, viewed in isolation, could not have had a substantial effect on the verdict.

There is no doubt that March's testimony was prejudicial, even if it did not amount to an unequivocal confession. Postiglione testified that March stated that "he wanted to close this chapter in his life" (Trial Tr. Vol. 18, at 2131, ECF No. 37-4, at 81); asked "persistently" if the police had located Janet March's body and about what other evidence the police possessed, other than circumstantial evidence (*id.*); and, later, stated that he wanted to plead guilty to the murder of Janet March (Trial Tr. Vol. 18, at 2132, ECF No. 37-4, at 82). He told Postiglione that he knew "specifics about the case" that the police did not know, and that "[p]rior to the Janet incident, [March] ha[d] not been involved in any other criminal-type activity." (*Id.*) Postiglione also indicated that March talked repeatedly about a plea bargain that would permit him to serve "no less than five years no more than seven years in actual time" (Trial Tr. Vol. 18, at 2134, ECF No. 37-4, at 84), and told him that if he was able to reach an agreement with the authorities "he would be 100 percent honest. He would answer all of their questions honestly and be truthful . . . assuming a deal could be worked out. . . ." (*Id.*) Notwithstanding, Postiglione's testimony on direct examination regarding March's statements comprised approximately three pages of a trial transcript that covered approximately 2500 pages, and the testimony took a minimal amount of time in the context of a nine-day trial during which the jury heard testimony from literally dozens of witnesses.[5] Moreover, the other evidence in the case overwhelmingly supported a conclusion that March was guilty of the murder of his wife. In particular, March's father—to whom March was very close, and whom March described as

---

[5] The cross-examination of Postiglione about that aspect of his testimony covered roughly eleven additional pages. (*See* Trial Tr. Vol. 19, at 2246–57, ECF No. 37-6, at 69–80.)

being willing to take a bullet for him—testified that March admitted to him, obliquely, that Janet had died in an "accident" after an argument. Arthur March also testified that he got rid of a computer hard-drive and another computer component at his son's request,[6] and that he helped his son dispose of Janet March's remains.

Although the Court concludes that March did not validly waive his Sixth Amendment rights and that his statements to Postiglione should have been suppressed at trial, and further that the Tennessee Court of Criminal Appeals' conclusion to the contrary amounted to an unreasonable application of clearly established federal law, March is nonetheless not entitled to relief on the basis of this claim, because even if the statements had been suppressed, the outcome most certainly would have been the same. The Court concludes that the error in admitting those statements into evidence did not have a substantial, injurious effect on the jury's verdict. March is therefore not entitled to relief on the basis of this claim.

### Ground 3. That admission of evidence of jailhouse interactions between the petitioner and Russell Nathaniel Farris, a/k/a Bobby Givings, who was cooperating with authorities, violated the petitioner's right to counsel

While March was in jail in Davidson County awaiting trial on the charge of murdering his wife, he engaged in inappropriate dealings and conversations with a fellow inmate, Russell Nathaniel Farris, who became a government informant and agent. As discussed in the factual summary, above, Farris testified that he was arrested on various violent felony charges at the end of April 2005 and was transferred to the Special Management Unit on the fourth floor of the Davidson County Criminal Justice Center in May 2005. He was still housed there when March arrived in August 2005. March began talking to Farris immediately upon his arrival. He would talk to Farris through a crack in Farris's cell door during March's recreation period. After "numerous conversations," March allegedly asked Farris to kill Janet March's parents, Lawrence and Carolyn Levine. Farris testified that he and March had daily conversations about this idea for approximately a month before Farris became concerned that he might be charged with conspiracy, and spoke to his mother and attorney about his conversations with March. Ultimately, after a meeting with police officers and the district attorney general's office, Farris agreed to record his conversations with March. He recorded several conversations with March in which the murder of the

---

[6] The hard-drive to March's computer had mysteriously disappeared when Detective David Miller executed a search warrant for the computer on September 17, 1996. (*See* Trial Tr. Vol. 9, at 1047–49, ECF No. 36-2, at 113–15.)

Levines was discussed. Other inmates testified that they saw March and Farris having secretive conversations, and several conversations between Farris and March's father, Arthur March, the co-conspirator in the conspiracy to kill the Levines, were also recorded. Finally, Arthur March also testified via deposition about having entered a guilty plea in federal court to the charge of solicitation to commit murder and that the Levines were the intended victims of the plot. Arthur March was given a fairly lenient sentence on that charge in exchange for his truthful testimony in his son's murder trial. He also testified that his son had confessed the accidental killing of Janet Levine to him, and that Arthur March helped his son dispose of Perry March's computer hard drive and Janet March's remains.

March filed a motion to exclude evidence of his recorded conversations with Farris, which the trial court denied in a written order filed July 24, 2006. March also argued on appeal to the Tennessee Court of Criminal Appeals that introduction of this evidence violated his right Sixth Amendment right to counsel, as established by *Maine v. Moulton*, 474 U.S. 159 (1985). The respondent concedes that this claim for relief was fully exhausted in the state courts and is ripe for review by this Court.

The Tennessee Court of Appeals framed the issue as follows:

> As noted previously, once a defendant's Sixth Amendment right to counsel has attached, the State may not directly or indirectly obtain incriminating statements from a defendant concerning the charged offense outside the presence of the defendant's counsel unless the defendant voluntarily and knowingly waives his right to counsel. [*Michigan v.*] *Harvey*, 494 U.S. [344,] 349 [(1990)]; *Brewer* [*v. Williams*], 430 U.S. [387,] 405 [(1977)]; *Massiah*, 377 U.S. at 206. Incriminating statements concerning an indicted offense obtained in violation of the Sixth Amendment are not admissible in a trial of the offense for which the defendant has been formally charged at the time the statements were made. *See Massiah*, 377 U.S. at 206. On the other hand, a defendant's voluntary statements concerning a crime for which he or she has not yet been charged are not afforded Sixth Amendment protection. Such statements are admissible in a subsequent trial of the previously uncharged offense because the Sixth Amendment right to counsel had not yet attached to the uncharged offense. [*Texas v.*] *Cobb*, 532 U.S. [162,] 173 [(2001)]. What is not specifically addressed in these United States Supreme Court opinions is whether an indicted defendant's voluntary statements about a separate offense for which he or she has not been formally charged are admissible, if relevant, in the trial of the indicted offenses.
>
> The issue is whether Defendant's statements to Mr. Farris which incriminate Defendant in the murder of Janet March, but do not include comments directly about the homicide of Janet March, were obtained in violation of the Sixth Amendment.

*March*, 395 S.W.3d at 774–75 (internal citations to state court opinions omitted).

The Tennessee Court of Criminal Appeals ultimately concluded that "the admission of Defendant's statements to Mr. Farris concerning the as yet uncharged conspiracy to kill the Levines in his

trial for the murder of Janet March did not violate Defendant's Sixth Amendment right to counsel." *Id.* at 779. In reaching that conclusion, the court considered and rejected March's argument that the Supreme Court's holding in *Maine v. Moulton*, as interpreted by the First Circuit in *United States v. Bender*, 221 F.3d 265 (1st Cir. 2000), should apply in his case. *Moulton*, like the case at bar, involved the admissibility of a defendant's uncounseled post-indictment statements to a co-defendant who was operating as an undercover agent for the State, but the statements were directly incriminating as to the already-charged crimes. In that case, Moulton and his co-defendant, Colson, were both indicted by a county grand jury in Maine on multiple counts of receiving stolen property. Both defendants retained counsel, entered pleas of not guilty and were released on bound. Prior to trial, Colson indicated to the local chief of police that he wished to meet with the police to talk about the charges against him. Before that meeting occurred, Colson met with Moulton to plan for their upcoming trial. During the discussion, Moulton suggested the possibility of killing Gary Elwell, a witness for the prosecution, and the two defendants discussed how to commit the murder. A few days later, Colson and his attorney met with police authorities. Colson made a full confession of his participation with Moulton in the crimes with which they were charged, and admitted to participating in other crimes as well. Colson also discussed with the police Moulton's inchoate plan to kill Elwell. The police offered Colson a deal under which no further charges would be brought against Colson in exchange for his agreement to testify against Moulton and otherwise cooperate in the prosecution of Moulton on the pending charges. Colson agreed.

As part of that agreement, Colson consented to wear a body transmitter to record what was said at a meeting between Colson and Moulton. The police knew that the express purpose of the meeting was for the two to discuss their planned defense at the approaching trial on the indicted offenses. At the meeting between the co-defendants, the police recorded a lengthy conversation during which Moulton expressly abandoned any plan to kill the witness Elwell, but, as expected, made numerous statements incriminating him in the already-pending charges, several of which were deliberately drawn out by Colson by claiming not to remember certain details and by reminiscing about other details of various crimes they had committed together. Moulton's recorded statements were later admitted into evidence against him at trial.

Molson was found guilty on the charges covered in the original indictments and several new

charges as well. He appealed generally on the ground that the admission into evidence of his recorded statements to Colson violated his Sixth Amendment right to counsel. The Supreme Judicial Court of Maine remanded for a new trial, holding that, as to the admission of Moulton's recorded statements to Colson, the prosecution could not use against Moulton at trial recordings of conversations where the state knew or should have known that Moulton would make incriminating statements regarding crimes as to which charges were already pending, regardless of whether the police had wired Colson for an admittedly legitimate purpose, *i.e.*, investigating threats against witnesses. It further determined that Moulton's statements might be admissible in the investigation or prosecution of charges for which, at the time the recordings were made, adversary proceedings had not yet commenced and the Sixth Amendment right to counsel had not yet attached. The Supreme Court of the United States granted the state's petition for certiorari, and affirmed the decision of the Supreme Judicial Court of Maine.

Justice Brennan, writing for the majority, framed the issue as follows:

> The question presented in this case is whether respondent's Sixth Amendment right to the assistance of counsel was violated by the admission at trial of incriminating statements made by him to his codefendant, a secret government informant, after indictment and at a meeting of the two to plan defense strategy for the upcoming trial.

*Moulton*, 474 U.S. at 161. In addressing this issue, the Court reviewed its holdings in *Massiah* and *United States v. Henry*, 447 U.S. 264 (1980), and rejected the state's contention that the decisive fact in those cases was that the police had set up the confrontation between the accused and a police agent. Justice Brennan wrote:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the state. As noted above, this guarantee includes the state's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or by happenstance—the state obtains incriminating statements from the accused after the right to counsel has attached. However, the knowing exploitation by the state of an opportunity to confront the accused without counsel being present is as much a breach of the state's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the state obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

474 U.S. at 176. Applying that principle to the facts of the case, the *Moulton* decision noted that the police suggested to Colson that he record the conversation during his meeting with Moulton and arranged for

the recording, knowing that Moulton and Colson were meeting for the express purpose of discussing *pending charges* and planning a defense to those charges. The Court found that, by concealing the fact that Colson was an agent of the state, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment.

The Court expressly reaffirmed its holding in *Massiah*, regarding the propriety of "continu[ing] an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted." *Id.* at 178. The holding in *Moulton* was expressly limited to its facts: "All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." *Id.* In a footnote, the *Moulton* Court added: "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 180 n.16.

To this Court's knowledge, only the First Circuit has considered and applied *Moulton* in a case involving a factual scenario similar to that presented here. In *Bender*, the defendant, while in jail awaiting trial on charges of being a felon in possession of a firearm, conversed with an undercover government agent concerning his plot to falsify an alibi and possibly kidnap and murder government witnesses. The agent was specifically instructed not to discuss the pending felon-in-possession charges. After the government informed the defendant that it would seek to introduce his statements in the pending criminal case, he moved to have them suppressed. Applying *Maine v. Moulton*, 474 U.S. 159 (1985), the district court found that the statements were incriminating and obtained in violation of the Sixth Amendment, and therefore granted the motion to suppress. On appeal, the government argued that admission of the statements would not violate the Sixth Amendment because the statements concerned future, unindicted crimes unrelated to the pending charges and were not *directly* incriminating as to the already-indicted charges, and that the government did nothing wrong in obtaining the statements.

The First Circuit rejected both arguments and affirmed on the basis of *Moulton* and other Supreme Court precedent, as follows:

> A person is "denied the basic protections of [the Sixth Amendment's] guarantee [of the right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States*, 377 U.S.

201, 206 (1964). . . . And, as noted in *Moulton*, "what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?" *Moulton*, 474 U.S. at 171 (internal quotation marks and citation omitted).

Thus, the accused is guaranteed, "at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Id.* at 176. It is irrelevant who initiates the conversation that is likely to induce the accused to make incriminating statements without the assistance of counsel. *See id.* at 174–75; *United States v. Henry*, 447 U.S. 264, 270–75 (1980). Although "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," the "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Moulton*, 474 U.S. at 176. Further, "that the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation." *Moulton*, 474 U.S. at 176 n.12. The government, here, does not ask us to rethink the rule in *Moulton*, nor does it argue that the incriminating statements were obtained by luck or happenstance.

Instead, the government contends, primarily, that, since the incriminating statements concerned different and future crimes, unrelated, it says, to the pending charges, the Sixth Amendment does not apply. We disagree. The statements were incriminating not only as to future crimes (perjury, conspiracy to kidnap and murder) but also as to the pending charges. So long as the statements were incriminating as to the pending charges and were deliberately elicited by government agents, they cannot constitutionally be admitted in the trial of those charges. *Cf. id.* at 180 (holding that the Sixth Amendment does not permit the introduction of directly incriminating statements obtained during the investigation of other crimes).

At bottom, the government's position is that *Moulton* is limited to direct statements by the defendant about the crime with which he has been charged. Nothing in *Moulton* supports that limitation, and Sixth Amendment jurisprudence is to the contrary. *See Massiah*, 377 U.S. at 207. All that matters is that the statements were incriminating as to the pending charges; it does not matter how. So while Bender's statements suborning perjury did not provide direct evidence in the pending case (*e.g.*, underlying facts, details, and strategy) or amount to an explicit confession, they "strongly tended to show that a guilty mind was at work." *United States v. Lozada-Rivera*, 177 F.3d 98, 107 (1st Cir. 1999) (suppressing similar jailhouse statements because of Sixth Amendment violation). It was obvious that questioning Bender about a false alibi for the underlying charges would result in his making incriminating statements as to those charges. The same was true of a plot to do away with government witnesses. Bender's statements, therefore, were likely to be incriminating as to the pending charges, were deliberately elicited post-indictment, and were obtained in the absence of counsel. . . .

The government argues, as well, that suppression is illogical because the district court found that the government did nothing wrong. The same argument was presented and rejected in both *Massiah* and *Moulton*. See *Massiah*, 377 U.S. at 207; *Moulton*, 474 U.S. at 179. Though the government might be investigating entirely separate crimes, "dual purposes may exist whenever police have more than one reason to investigate someone." *Moulton*, 474 U.S. at 179 n.15. That the government might have other legitimate reasons for confronting a person who is accused does not eliminate the violation of the right as it pertains to the pending charges. *See id.* at 179–80; *see also id.* at 180 ("To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for

> their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*.").

*Bender*, 221 F.3d at 268–70 (footnotes and some citations omitted).

Instead of adopting the *Bender* court's reasoning and its construction of *Moulton*, the Tennessee court reaffirmed the decision reached in an earlier decision from the Tennessee Court of Criminal Appeals, *State v. Snyder*, No. 03C01-9403-CR-00101, 1995 WL 687581 (Tenn. Ct. Crim. App. Nov. 21, 1995), which was also in a procedural posture similar to that here. The *Snyder* court had held that

> the tape-recorded statements of the defendant did not include any information about the crimes with which he had already been charged. The defendant was not directly incriminated by the content. From all outward appearances, the purposes of the "wire" was to corroborate evidence of [the defendant's] attempt to get [another inmate, who, unbeknownst to defendant was acting as an informant,] to testify falsely. Thus, the admission of those statements, evidence of the defendant's guilt of a separate offense, did not compromise his right to counsel on the initial charges.

*March*, 395 S.W.3d at 777 (quoting *Snyder*, 1995 WL 687581, at *4 (citing *Greico v. Meachum*, 533 F.2d 713, 717 (1st Cir.1976)).

In response to March's argument that the holding in *Greico*, which predated *Moulton*, had been abrogated by *Bender*, also from the First Circuit, the Tennessee court noted that the *Snyder* decision also relied on *United States v. Moschiano*, 695 F.2d 236 (7th Cir. 1982), in which the Seventh Circuit concluded that post-indictment statements concerning a separate crime which did not refer to the charged offense may be introduced, if relevant, in a trial on the charged offenses. The Tennessee court did not note that *Moschiano* also predated *Moulton*, but did observe that in March's case, unlike the situation in *Moulton*, "there [was] no evidence in the record that using Mr. Farris to obtain more information about the conspiracy plot was merely a ruse by the State to encourage incriminating statements from Defendant about the charged offenses." *March*, 395 S.W.3d at 778 (citing *Moschiano*, 695 F.2d at 242–43; *United States v. Anderson*, 523 F.2d 1192, 1195–96 (5th Cir. 1975)). The court found *Snyder* particularly persuasive because there was likewise no evidence in that case of a ruse to obtain information about the charges on which the defendant had already been indicted. The court ultimately held that the admission of March's recorded statements to Farris "concerning the as yet uncharged conspiracy to kill the Levines in his trial for the murder of Janet March did not violate [March's] Sixth Amendment right to counsel." *March*, 395 S.W.3d at 779.

As set forth above, habeas relief may not be granted unless the petitioner establishes that the state court's adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Consequently, the issue before this Court is whether the Tennessee court's decision was contrary to or amounted to an unreasonable application of the law as clearly established by *Moulton* and its predecessors to the facts of this case.

The Supreme Court has issued a series of decisions establishing the standard of review in habeas cases for applying § 2254(d)(1). In *Williams v. Taylor*, 529 U.S. 362, 404 (2000), the Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

*Id.* at 405–06 (citations omitted). *See also Price v. Vincent*, 538 U .S. 634, 640 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). The Tennessee court did not apply a rule contradicting clearly established Supreme Court precedent, and the facts of this case are not "materially indistinguishable" from those of *Moulton* or any other Supreme Court case of which this Court is aware.[7] The "contrary to" standard does not apply in this case.

---

[7] Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit has explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

*Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1999)(citing 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4261.1 (2d ed. Supp. 1998)); *see also Harris*, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). In determining whether a rule is "clearly established," a habeas court is

A federal court may also grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Cone*, 535 U.S. at 694; *see also Andrade*, 538 U.S. at 75; *Williams*, 529 U.S. at 409.[8] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. *See also Andrade*, 538 U.S. at 75 (holding that the lower court erred by equating "objectively unreasonable" with "clear error," and noting that "[t]hese two standards . . . are not the same"); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)").

Ultimately, this Court does not find that the Tennessee court's decision amounted to an unreasonable application of federal law. First, March's arguments to the contrary notwithstanding, the facts in *Moulton* are materially distinguishable from those here. The police in March's case did not intentionally set out to elicit information, through a confidential informant, concerning crimes for which March had already been indicted. Second, the information elicited by Farris was not directly related to the charges on which March had already been indicted, even though the information, as the *Bender* court stated, "strongly tended to show that a guilty mind was at work." *Bender*, 221 F.3d at 269 (citation

---

entitled to rely only on "the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

[8] Although the Supreme Court in *Williams* recognized, *in dicta*, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," *id.* at 408. The *Williams* Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," *id.* at 408–09. In *Yarbrough v. Alvarado*, 541 U.S. 652, 666 (2004), the Supreme Court further stated:

Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. *Cf. Teague v. Lane*, 489 U.S. 288 (1989). At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.

omitted). The Tennessee state court was clearly cognizant of the relevant precedent; it considered the applicable cases at length; it took note of the distinguishing facts in March's case; and in the end it simply did not construe *Moulton* in the same way as the First Circuit Court of Appeals. That circuit court's opinion clearly had no precedential or binding effect in the Tennessee state court, and the Tennessee court's decision was not objectively unreasonable.

In addition, however, the Tennessee Court of Criminal Appeals found that, even if admission of the evidence had violated the Sixth Amendment, "such error was harmless beyond a reasonable doubt." *March*, 395 S.W.3d at 779. Even if this Court were to presume that the Tennessee court's decision amounted to an unreasonable application of clearly established federal law, the harmless error analysis, as discussed above, applies in those instances where statements are obtained and introduced into evidence under circumstances that violate the Sixth Amendment right to counsel. *See Milton v. Wainwright*, 407 U.S. 371, 372–73 (1972) (holding that the error, if any, in the admission of post-indictment, pretrial confession obtained by a police officer who posed as fellow prisoner confined in cell with petitioner was harmless beyond a reasonable doubt, where the jury, "in addition to hearing the challenged testimony, was presented with overwhelming evidence of petitioner's guilt"). For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Under that standard, the Court finds that if there was any error in admitting the evidence at issue, it did not have a substantial and injurious effect or influence on the verdict. As an initial matter, even if the tape recordings of the conversations between Farris and March, obtained while Farris was working as a government agent, had been excluded, evidence of that plot would have been introduced in different form, including Farris's testimony that he and March had been discussing the conspiracy for approximately a month before Farris went to the police with the information, as well as Farris's recorded conversations with Arthur March, and Arthur March's confession. Thus, the tape recordings of Farris's and Perry March's conversations were effectively cumulative and unlikely to have had a significant impact on the jury. Further, evidence of the conspiracy to kill the Levines was not directly related to the question of whether Perry March was guilty of murdering Janet March, and as such was not likely to have had a

substantial impact on the jury's decision of whether March was guilty of actual murder. And finally, as discussed above in connection with March's other Sixth Amendment claim, the evidence arrayed by the State against him, though primarily circumstantial, nonetheless was fairly weighty in terms of both volume and substance.

In sum, the Court concludes that even if the statements had been suppressed, the result would have been the same. Regardless of whether a Sixth Amendment violation occurred, March is not entitled to relief on the basis of this claim, because the error, if any, in admitting the challenged statements into evidence did not have a substantial, injurious effect on the jury's verdict.

**Ground 7: That the cumulative effect of the errors identified in the habeas petition rendered the petitioner's trial fundamentally unfair, such that his convictions violate the constitutional due process guaranties.**

Even if the Court assumes for the sake of argument that the state court violated March's constitutional rights both in its admission of statements made by March to Postiglione during his transport from Los Angeles to Nashville and the recorded statements made by March to Nathanial Farris while Farris was functioning as a government agent, the Court nonetheless concludes that the evidence admitted over March's objections, considered cumulatively, did not have a substantial, injurious effect on the jury's verdict. The Court has already concluded that Postiglione's testimony about March's statements during the trip from Los Angeles to Nashville did not affect the verdict. Evidence of March's recorded conversations with Farris added very little to the overall equation.

**III      CONCLUSION**

For the reasons set forth herein, the Court finds that March's petition is without merit. His claims for relief will therefore be denied, and this matter dismissed.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition

should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[A] COA does not require a showing that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

In this case, the petitioner has "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c), and has demonstrated that reasonable jurists could debate whether this petition should have been resolved differently. The Court will grant a COA as to each of the claims raised in the petitioner's habeas petition, as amended.

An appropriate order will enter.

_____
Kevin H. Sharp
United States District Judge